Jose Jesus SANCHEZ, et al., Plaintiffs,

v.

Tom OVERMYER, et al., Defendants.

No. 3:92CV7444.

United States District Court,
N.D. Ohio,
Western Division.

May 2, 1995.

1254

Randall C. Marshall, Patricia Y. Hernandez, Advocates For Basic Legal Equality, Inc., Toledo, OH, for plaintiffs.

Jodie Lee Stearns, Mitchell, Stearns & Hammer, Bowling Green, OH, for defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

JOHN W. POTTER, Senior District Judge:

This action was brought by plaintiffs against their former employer, Tom and Sandra Overmyer ("Overmyers"), and the Overmyers' farm labor contractor, Kerry Gomez. Plaintiffs' complaint alleged numerous violations of the Migrant & Seasonal Agricultural Worker Protection Act ("AWPA"), 29 U.S.C. §§ 1801–1872, and the Federal Insurance Contributions Act ("FICA"), 26 U.S.C. §§ 3101–3128.

On summary judgment, this Court determined that plaintiffs were entitled to judgment on their FICA claims that the Overmyers failed to withhold and pay social security taxes from the individual earnings of Jose Jesus and Petra Sanchez and that the Overmyers failed to pay the employer's share

of social security taxes for each of them. The Court also determined that the Overmyers intentionally committed the following AWPA violations: (1) failure to post or present plaintiffs with a statement of the terms and conditions of housing (§ 1821(c)); (2) failure to keep accurate wage records (§ 1821(d)(1)); (3) failure to provide plaintiffs with accurate wage statements (§ 1821(d)(2)); (4) failure to pay plaintiffs' wages when due (§ 1822(a)); and (5) housing plaintiffs in an unlicensed labor camp (§ 1823(b)(1)).

A trial to the Court on the remaining AWPA claims, AWPA damages, and relief due plaintiffs under the FICA was held between October 4, 1994 and October 6, 1994. The primary factual questions to be determined by the Court are: (1) whether the housing provided to plaintiffs failed to comply with substantive state and federal health and safety standards, and (2) whether Gomez "controlled" the migrant workers' housing within the meaning of the Act.[1]

In accordance with Fed.R.Civ.P. 52(a), the Court has considered and weighed all of the evidence and resolved any conflicts therein and now makes the following independent findings of fact and conclusions of law.

*Findings of Fact*

1. The Overmyers owned and operated an agricultural labor camp located in Fremont, Ohio.

2. Plaintiffs are a family of migrant farm workers which includes Jose Jesus and Petra Sanchez; their son, Jose Pedro Sanchez; and their niece, Josefa Zepeda. The family lived in Units 12 and 13 at the Overmyer labor camp from the spring of 1989 until approximately November 12, 1989.

3. The Sanchez family began bringing their niece to the Overmyer camp three to four years prior to 1989. The Overmyers knew that four people, including Josefa Zepeda, were living in Unit 13 in 1989.

4. In 1989, Jose Pedro Sanchez was 11 years old and Josefa Zepeda was 14 years old. Neither child was employed by the Overmyers, nor were they engaged in any other agricultural employment during the 1989 season.

5. Jose Jesus and Petra Sanchez were employed by the Overmyers until October, 1989. After that time, Jose Jesus Sanchez was employed at a nearby sugar beet factory; however, the family continued to live at the Overmyer labor camp until approximately November 12, 1989.

6. Defendant Kerry Gomez was a full-time hourly employee of the Overmyers in 1989 and lived in the labor camp during this time.

7. Gomez' duties included assisting the Overmyers in both the farming operations and the labor camp. Gomez' duties also included acting as a translator. She was the person workers went to with complaints about the housing or if something needed to be corrected in the labor camp; however, she had no decision making authority herself. Rather, it was her responsibility to inform the Overmyers of any problems that arose in the camp. Her responsibilities included making minor repairs when needed; however, minor repairs were not solely her responsibility, and she did so only after consulting the Overmyers.[2] Although she maintained some supplies for the camp in her own trailer, these consisted only of toilet paper and light bulbs. Gomez was authorized to charge supplies for the labor camp on the Overmyers' accounts, however, the Overmyers decided which supplies she was to purchase. She did not assign housing, but merely relayed the Overmyers' decisions regarding housing assignments to the workers.

8. Gomez was registered as a farm labor contractor with the U.S. Department of Labor but was not authorized to house workers.

9. Shower and handwashing facilities were not maintained in a clean and sanitary condition as indicated by testimony and

---

1. Plaintiffs allege that Gomez controlled the housing without the authorization required under AWPA and, in doing so, violated several AWPA provisions.

2. Testimony at trial indicates that Mrs. Overmyer and her son also made minor repairs at the camp.

plaintiffs' Exhibits 30.9 to 30.12. In addition, although workers were told not to wash their dishes in the sinks located in the shower facility, the Overmyers were aware that some workers still did so.[3] Washing dishes in the sinks caused food to plug the sinks. Therefore, drainage pipes were designed to be easily removed to prevent the sinks from becoming plugged. However, as a result, the drainage pipes were frequently disconnected from the sinks allowing wash water and food particles to drain directly onto the floor. The floor drain into which the pipes drained also frequently became plugged with food causing a foul odor in the facility.

Mr. Overmyer testified that the occupants of the camp were required to clean the facility as a term or condition of occupancy; however, the regulations clearly placed the responsibility of ensuring that the facility is in a clean and sanitary condition with the owner/operator. *See* Ohio Admin.Code § 3701–33–18(B). Mrs. Overmyer testified that the facility was cleaned once a week, and Gomez testified that she and several volunteers cleaned it two to three times per week. These efforts, however, did not go far enough. The shower facility was frequently in an unsanitary condition.

10. Toilet facilities were not maintained in a safe and sanitary condition. No lighting was provided on the path leading to the toilet facilities. On September 20, 1989, an inspector from the Ohio Department of Health (ODH) cited defendants for a violation due to a failure to pump out the toilets. The Overmyers apparently did not inspect the toilet facilities themselves but, rather, relied on others, presumably Gomez, to inform them when the toilets needed to be pumped.[4] Go-mez testified that she and her family used these facilities and that she cleaned them two to three times per week; thus, she should have been aware of the need for the toilets to be pumped.

11. Plaintiffs' living accommodations were overcrowded in that there was between 144 to 225 square feet of living space in Unit 13 for the four plaintiffs for cooking, eating, and sleeping purposes.[5]

12. Plaintiffs were not provided with a sufficient number of beds while occupying Unit 13, and the Sanchez' son was required to sleep on the floor. It is undisputed that the Overmyers knew that an insufficient number of beds were provided.[6]

13. While plaintiffs occupied the camp prior to June 1 and after August 31, heat was not provided during their occupancy even though the temperature was below freezing at times. Although the Overmyers had portable heaters in storage at the camp, plaintiffs were not aware of their availability. Plaintiffs, in fact, asked to move to a trailer in Unit 12 in the fall because it was not as cold as Unit 13.

14. Conflicting evidence was presented as to whether or not Unit 13 was weather tight. The Court finds that plaintiffs did not meet their burden of persuasion on this issue and, therefore does not list this as one of the substantive standards with which the Overmyers did not comply.

15. Trash was removed from the camp only once a week. This was insufficient as the trash dumpster overflowed and attracted flies.

---

**3.** Gomez testified, however, that the Sanchez family did not wash their dishes in the shower room sinks.

**4.** Mrs. Overmyer testified that she was informed when the toilets needed to be pumped. Mr. Overmyer testified that one of Gomez's responsibilities was to inform him of conditions in the camp that needed attention. Thus, the Court assumes that Gomez had the duty of informing the Overmyers of the need to pump the toilets.

**5.** State and federal regulations require 60 square feet of floor space per occupant for units used for the combined purposes of cooking, eating and sleeping. Ohio Admin.Code § 3701–07(A)((6)(c); 20 C.F.R. § 654.407(c)(3). Petra Sanchez testified that unit 13 was approximately 12 feet by 12 feet, while Gomez testified that the unit was approximately 15 feet by 15 feet.

**6.** Defendants' testimony that they offered to place bunk beds in the room and that Mrs. Sanchez declined, a matter disputed by Mrs. Sanchez, is not a defense. Moreover, as the Court states later in this opinion, the health and safety standards were intended to protect the children of the workers, as well as the workers themselves. The Overmyers had a legal obligation to provide an extra bed.

16. On September 20, 1989, an inspector for the ODH found that emergency telephone numbers were not posted. However, the Court does not find this to be an intentional violation of federal and state safety and health standards. To be an intentional violation, defendants would have had to have actual or implied knowledge that the numbers were not posted.[7] Presumably, defendants had posted these numbers at the time the camp was certified since the April and May inspections by the ODH indicated no violation for failure to post emergency numbers. There was no evidence regarding the length of time that the numbers were not posted. Thus, the Court cannot conclude that defendants intentionally failed to post emergency numbers.

17. During the 1989 season, plaintiffs moved from Unit 13 into a trailer in the camp. The stairs to the trailer were not in a safe condition; however, defendants promptly caused the steps to be repaired after being notified of their condition.

18. The plaintiffs made several attempts to resolve the issues in dispute before resorting to litigation. Plaintiffs' pre-filing offer to settle for $3,500.00 was reasonable. Defendants made no counteroffer to settle plaintiffs' claims prior to the action being filed.

19. The Overmyers profited by their failure to pay the employer's share of FICA taxes for all of their employees' work in pickles. Mr. Overmyer testified that a minimum of $30,000.00 in wages were paid to his pickle workers in 1989. Thus, the Overmyers avoided paying over $2,200.00 for the employer's share of FICA for 1989 alone.[8]

20. The Overmyers changed their method of bookkeeping; however, they still are not in compliance with the record keeping requirements of the Act, as evidenced by Defendants' Exhibit C.[9]

### Conclusions of Law

1. This Court has jurisdiction pursuant to 29 U.S.C. § 1854 and 26 U.S.C. § 3101, et seq.

2. The Overmyers are agricultural employers within the meaning of AWPA, 29 U.S.C. § 1802(2), and owned the migrant agricultural workers' housing in which plaintiffs lived.

3. Any person who owns or controls a facility used to house migrant farm workers is responsible for ensuring that such housing is properly licensed and complies with all substantive federal and state safety and health standards. 29 U.S.C. § 1823.

4. A person "controls" migrant agricultural workers' housing if that person "is in charge of or has the power or authority to oversee, manage, superintend or administer the housing facility or real property either personally or through an authorized agent or employee, irrespective of whether compensation is paid for engaging in any of the aforesaid capacities." 29 C.F.R. § 500.130(c).

5. Defendant Gomez did not "control" migrant housing within the meaning of AWPA, 29 U.S.C. § 1823(a).

6. The housing at issue was constructed prior to April 3, 1980. The federal housing standards applicable to such housing are the standards promulgated by the Employment and Training Administration (ETA) at 20 C.F.R. § 654.404 et seq. See 29 C.F.R. § 500.132 (owners of housing constructed prior to April 3, 1980, may elect to comply with either the standards promulgated by

7. The Court would imply knowledge if the emergency numbers had been removed for a period of time during which the owner should reasonably have inspected and learned of its removal. The owner cannot avoid liability simply by not inspecting the camp and later claiming ignorance of the conditions in the camp.

8. The applicable FICA rate in 1989 was 7.51%. 26 U.S.C. § 3111(a) and (b)(6).

9. Mrs. Overmyer testified that the second check in Exhibit C was for work in pickles which are paid on a piece rate. This check was issued in 1994 and still does not provide the number of hours worked to produce the earnings of $381.23. Section 1821(d)(1)(C) and (d)(2) require defendants to record the number of hours worked and disclose the hours to employees in the wage receipt. While Mrs. Overmyer did not testify as to the significance of the "1.00" following "Regular" on the pickle wage receipt, it is clear that farm workers do not make $381.23 per hour.

OSHA or those promulgated by the ETA.) [10] The State standards are found at Ohio Administrative Code § 3701–33–01, *et seq.*

7. Substantive federal and state safety and health standards

include, but are not limited to, those that provide fire prevention, an adequate and sanitary supply of water, plumbing maintenance, structurally sound construction of buildings, effective maintenance of those buildings, provision of adequate heat as weather conditions require, and reasonable protections for inhabitants from insects and rodents. Substantive housing standards do not include technical or procedural violations of safety and health standards. 29 C.F.R. § 500.133.

8. The Overmyers intentionally, as that term is defined in the law, violated AWPA's requirement that owners of migrant housing ensure that the property complies with substantive federal and state safety and health standards throughout the period of occupancy. *See* 29 U.S.C. § 1823(a).[11] The substantive standards not complied with include the following:

1. Shower and handwashing facilities were not maintained in a clean and sanitary condition. *See* 20 C.F.R. § 654.412(a); Ohio Admin.Code § 3701–33–12(A)(1).

2. Toilet facilities were not maintained in a safe and sanitary condition. *See* 20 C.F.R. 654.411(a) (requiring maintenance so as to prevent any nuisance or public health hazard); 20 C.F.R. § 654.410(c) (requiring adequate lighting on pathways to common use facilities); Ohio Admin.Code § 3701–33–11(A)(1) (requiring facility to be maintained in a sanitary condition); Ohio Admin.Code § 3701–33–10(A)(4) (requiring artificial lighting on pathways to common use facilities).

3. Plaintiffs' living accommodations were overcrowded. *See* 20 C.F.R.

§ 654.407(c)(3); Ohio Admin.Code § 3701–33–07(A)(6)(c) (requiring not less than 60 square feet per occupant).

4. Plaintiffs were not provided with a sufficient number of beds while occupying Unit 13. *See* 20 C.F.R. § 654.407(e); Ohio Admin.Code § 3701–33–16(A).

5. Heat was not provided to plaintiffs during their occupancy. *See* 20 C.F.R. § 654.409(a) (requiring heating equipment if the temperature in the quarters drops below 68 degrees); Ohio Admin.Code § 3701–33–09(A) (requiring heaters to be accessible to occupants at all times if the rooms are occupied before June 1 or after August 31).

6. Trash removal was inadequate. 20 C.F.R. § 654.414(b) (requiring refuse collection at least twice a week); Ohio Admin.Code § 3701–33–14(B) (requiring refuse collection at least once a week or more often if necessary).

9. Some of the conditions the Court finds violated federal and state standards also existed during a time when plaintiffs lived in the labor camp but were no longer employed by the Overmyers. This fact does not alter the violations found by the Court. Section 1823(a) provides that *"each person who owns or controls a facility ... which is used as housing for migrant agricultural workers"* is required to ensure that it "complies with substantive Federal and State safety and health standards applicable to that housing." 29 U.S.C. § 1823(a) (emphasis added). Congress obviously intended to apply the AWPA to non-employers when selecting their statutory wording to include "each person," not simply "each agricultural employer." *Howard v. Malcolm*, 629 F.Supp. 952, 954 (E.D.N.C.1986) (citations omitted). Following employment by the Overmyers, Mr. Sanchez worked in a sugar beet factory, which is "agricultural employment" within the meaning of § 1802(3).[12] Thus, Mr.

---

10. Because the OSHA standards are more rigorous, plaintiffs have assumed the application of the ETA standards. Defendants do not contend otherwise.

11. "Once such facility or property is occupied, such person [owner or controller] shall supervise and continually maintain such facility or proper-

ty so as to ensure that it remains in compliance with the applicable safety and health standards." 29 C.F.R. § 500.135(d).

12. Section 1802(3) defines "agricultural employment" to include "the handling, planting, drying, packing, packaging, processing, freezing, or grading prior to delivery for storage of any agri-

Sanchez remained a migrant agricultural worker within the meaning of the Act and the Sanchez family was protected by AWPA during their entire stay at the Overmyer camp.

10. AWPA provides a private right of action for "any person aggrieved by a violation of this chapter or any regulation under this chapter by a farm labor contractor, agricultural employer, agricultural association, or other person ..." 29 U.S.C. § 1854(a).

■ 11. Violations of § 1823(a) are actionable by all plaintiffs. The Court finds defendants' argument that the non-working children of migrant agricultural workers cannot recover for housing violations under the AWPA without merit. Rather, the Court finds the reasoning set forth in *Hernandez v. Ruiz,* 812 F.Supp. 734 (S.D.Tex.1993), persuasive and holds that the non-working children also have a private right of action pursuant to § 1854.

■ 12. As the Court has determined that Gomez did not "control" the housing at the Overmyer camp, the Overmyers did not violate 29 U.S.C. § 1842 in utilizing her services at the labor camp. Likewise, Gomez is not liable to plaintiffs for failing to post or present plaintiffs with a statement of the terms and conditions of housing (§ 1821(c)), housing plaintiffs in an unlicensed labor camp (§ 1823(b)(1)), controlling housing without authorization from the U.S. Department of Labor (§ 1811), or failing to identify the housing to be provided when applying for licensure as a farm labor contractor and failing to certify that such housing is in compliance with the requirements of the Act (§ 1812).

13. On plaintiffs' motion for partial summary judgment, the Court previously determined that the Overmyers violated the FICA

in failing to withhold and pay social security taxes from the individual earnings of Jose Jesus and Petra Sanchez and failing to pay the employer's share of social security taxes for each of them. Plaintiffs are entitled to an order requiring the Overmyer defendants to take all steps necessary to correct the amount of wages and taxes reported to the federal government relating to the working plaintiffs' employment in 1989, and to pay any FICA taxes owing as a result of that employment. This includes not only correcting the records and paying the taxes for plaintiffs' wages earned in the Overmyers' pickle crop, but also unscrambling the remaining 1989 earnings that the Overmyers incorrectly reported to the IRS by combining Mr. and Mrs. Sanchez' earnings in other crops.[13] The Overmyer defendants will further be ordered to provide proof to plaintiffs' counsel that such steps have been taken.

14. The AWPA permits the Court to award actual damages or statutory damages of up to $500.00 per plaintiff per violation. 29 U.S.C. § 1854(c)(1). Plaintiffs seek statutory damages. The Act permits the Court "to consider whether an attempt was made to resolve the issues in dispute before the resort to litigation." 29 U.S.C. § 1854(c)(2).[14]

15. The district court in *Bueno v. Mattner,* 633 F.Supp. 1446, 1467 (W.D.Mich.1986), aff'd, 829 F.2d 1380 (6th Cir.1987), cert. denied, 486 U.S. 1022, 108 S.Ct. 1994, 100 L.Ed.2d 226 (1988), set forth other considerations relevant to determining an award of AWPA damages as summarized by the Fifth Circuit:

> "Deterrent effect may be achieved without awarding exemplary damages. Whether an award accomplishes this purpose, in addition to affording compensation, is determined by considering not only

---

cultural or horticultural commodity in its unmanufactured state." 29 U.S.C. § 1802(3).

**13.** Although defendants would have the Court refrain from ordering the untangling of wages paid in other crops, Mrs. Overmyer testified that she could approximate what each working plaintiff should have been paid by reviewing their time cards.

**14.** Plaintiffs cite *Frenel v. The Freezeland Orchard Co., Inc.,* 28 Wage & Hour Cas. (BNA) 666, 1987

WL 46894 (E.D.Va.1987), for the proposition that the Court may also consider post-filing settlement discussions. However, the Court does not find that *Frenel* supports that proposition. Although the *Frenel* court referred to defendant's "nominal offer of judgment," the accompanying footnote clearly indicates that the court was referring to attempts to resolve the issues *before* the action was commenced.

the amount allowed to each plaintiff for each violation but also the total amount of the award, the nature and persistence of the violations, the extent of the defendant's culpability, damage awards in similar cases, the defendant's ability to prevent future violations of the Act, the substantive or technical nature of the violations, and the circumstances of each case. Plainly, it ought not to be cheaper to violate the Act and be sued than to comply with the statutory requirements. Nor should a worker who sues for violations find recovery inadequate to cover his personal costs in filing suit, testifying, and paying attendant attorney's fees, recovery of which is not allowed by the Act. Further, the legislative history of the Act notes that farm workers who attempt to assert their rights must overcome a general background of fear and intimidation caused by the widespread practice of retaliation against those who complain about violations. Awards should be adequate to encourage workers to assert their statutory rights." [citing *Beliz v. W.H. McLeod & Sons Packing Co.*, 765 F.2d 1317, 1332–33 (5th Cir.1985) ]. A court should also consider "the total number of plaintiffs involved, the total number of violations, and the total amount that will be exacted from the delinquent defendant." *Id.* at 1333.

The Fifth Circuit also stated:

The legislative history of the Act and the decisions interpreting it make clear that the purpose of this civil remedy is not restricted to compensation of individual plaintiffs. It is designed also to promote enforcement of the Act and thereby deter and correct the exploitive practices that have historically plagued the migrant farm labor market.

*Beliz,* 765 F.2d at 1332.

■ 16. Section 1854(c) provides that "multiple infractions of a single provision of this chapter or of regulations under this chapter shall constitute only one violation for

purposes of determining the amount of statutory damages due a plaintiff...." 29 U.S.C. § 1854(c)(1). Thus, the multiple infractions of § 1823(a) shall be considered as one violation. Although defendants contend that their violation of § 1821(d)(1) and § 1821(d)(2) should also be considered as only one violation, the Court does not agree. These separate provisions require separate and distinct obligations of defendants and will be viewed as separate violations. *See, e.g. Cruz v. Vel–A–Da, Inc.,* 127 Lab.Cas. (CCH) ¶ 33,072, 1993 WL 659255 (N.D.Ohio 1993); *Bueno v. Mattner,* 633 F.Supp. 1446 (W.D.Mich.1986).

■ 17. In determining an award of damages, the Court has considered the settlement discussions prior to the filing of the lawsuit. Defendants testified that they attended a settlement conference with plaintiffs and plaintiffs' counsel; however, the discussions deteriorated when defendants were told that the plaintiffs in another lawsuit, which defendants had already agreed to settle, would never have shown up for trial. Although the Court finds this to be a mitigating factor, it is outweighed to some extent by defendants' testimony that they are unimpressed with plaintiffs' claims.

The Court has also considered the fact that the Overmyers have profited from their failure to pay FICA taxes on all of their employees, but are being held accountable for only the two working plaintiffs in this action. As the Fifth Circuit stated, "it ought not to be cheaper to violate the Act and be sued than to comply with the statutory requirements." *Beliz,* 765 F.2d at 1332. In addition, the Court has considered the number of plaintiffs that have brought this action and, thus, the relatively small total amount of the award, the nature of the violations and the fact that it is entirely within the power of defendants to prevent future violations, the legislative intent to encourage workers to assist in enforcing the Act, and damage awards in other cases.[15]

---

15. In other cases involving similar AWPA violations, awards have varied widely from a low of $15.00 per violation to the maximum of $500.00. *Compare Salazar–Calderon v. Presidio Valley Farmers Assoc.,* 765 F.2d 1334 (5th Cir.1992),

with *Leach v. Johnston,* 812 F.Supp 1198 (M.D.Fla.1992). The Court has reviewed all of the cases cited by defendants in which a relatively low amount per violation was awarded. In each case, the court considered the total amount

18. After considering all of these factors, the Court finds that an award of $300.00 per violation per working plaintiff is appropriate for violations of 29 U.S.C. §§ 1822(a), 1821(d)(1), and 1821(d)(2). The Overmyers' violation of § 1822(a) is based on their failure to properly pay FICA taxes due to combining wages and treating plaintiffs as independent contractors for their work in pickles. The Overmyers contend that their culpability is minimized by the fact that they were simply following the practice of the industry at the time. However, by 1989, this Court had ruled several times that, under circumstances similar to the instant case, farm workers harvesting pickles were employees.[16] *See Salinas v. Birkhold,* No. C87–7531 (N.D.Ohio, October 6, 1988); *Donovan v. Gillmor,* 535 F.Supp. 154 (N.D.Ohio 1982), *appeal dismissed,* 708 F.2d 723 (6th Cir. 1982). In 1985, the IRS had held likewise for purposes of the FICA. Rev.Rul. 85–85, 1985–1 C.B. 332. Thus, defendants should have had notice that the industry practice was suspect. In addition, defendants should have known the practice of combining wages and, thus, paying FICA taxes on the income of only one family member violated the FICA which, by its terms, provides that taxes are imposed on the income of every *individual* employee.

The Overmyers also contend that their violation of the record keeping provisions of the Act were mere technical violations. Nevertheless, the record keeping requirements "are designed in part to prevent minimum wage violations and other departures from the Fair Labor Standards Act." *Beliz,* 765

F.2d at 1333. Thus, these provisions are core protections offered by the Act. Although the Overmyers have revised their record keeping system, they have yet to fully comply with the Act.

 19. The Court further finds that an award of $350.00 per plaintiff is appropriate for violations of §§ 1823(b)(1), 1823(a), and 1821(c).

THEREFORE, for the foregoing reasons, good cause appearing, it is

ORDERED that the Overmyer defendants take all steps necessary to correct the amount of wages and taxes reported to the federal government relating to the working plaintiffs' employment in 1989, and to pay any FICA taxes owing as a result of that employment as set forth in this opinion. The Overmyer defendants are further ordered to provide proof to plaintiffs' counsel that such steps have been taken; and it is

FURTHER ORDERED that judgment be, and hereby is, entered against the Overmyer defendants and in favor of plaintiffs for violations of AWPA as follows: Jose Jesus Sanchez in the amount of $1,950.00; Petra Sanchez in the amount of $1,950.00; Jose Pedro Sanchez in the amount of $1,050.00; and Josefa Zepeda in the amount of $1,050.00.

---

to be exacted from the defendant due to the large number of plaintiffs and the number of violations involved and/or the amount awarded as damages for other violations, such as violations of the Fair Labor Standards Act (FLSA). *See, e.g., Salazar-Calderon,* 765 F.2d at 1347 (stating that "damages assessed for each violation appear thin when considered separately," however, the court could not "ignore their weight when combined in an award that included damages for other violations"); *Beliz,* 765 F.2d at 1333 (The court considered the effect of an award under the FLSA when determining the adequacy of the AWPA award, stating that it "might consider an award of $200 per plaintiff, for a total of $3,200, standing alone, manifestly inadequate.")

**16.** Other courts had likewise held that farm workers harvesting pickles were employees. *See,*

*e.g., Secretary of Labor v. Lauritzen,* 835 F.2d 1529 (7th Cir.1987) (pickle farm workers are employees under FLSA); *Yeska v. State, Labor and Indus. Review Comm'n.,* 149 Wis.2d 363, 440 N.W.2d 823 (App.1989) (pickle harvesters not independent contractors but covered employees under state unemployment law); *S.G. Borello & Sons, Inc. v. Dept. of Indus. Relations,* 48 Cal.3d 341, 256 Cal.Rptr. 543, 769 P.2d 399 (1988) (en banc) (pickle harvesters not independent contractors but employees covered by state worker's compensation law); *In re Wage and Hour Violation of Kokesch,* 411 N.W.2d 559 (Minn.App. 1987) (pickle harvesters not independent contractors, but employees covered by minimum wage law).