Elvira RODRIGUEZ, Pedro Rodriguez, Juan Peralta, Raul Mujica, Saul Mayo, and all similarly situated, Plaintiffs,

v.

Nolan CARLSON and Rebecca Carlson, a marital community, and Cherrystone, Inc., Defendants.

No. CY–95–3164–AAM.

United States District Court, E.D. Washington.

Sept. 30, 1996.

Rebecca A. Smith, Columbia Legal Services, Olympia, WA, for plaintiffs.

Scott Volyn, Foreman, Arch, Dodge & Volyn, Wenatchee, WA, for defendants.

## ORDER GRANTING PARTIAL SUMMARY JUDGMENT

McDONALD, District Judge.

On September 26, 1996, a hearing was conducted on plaintiffs' Motion for Summary Judgment (Ct.Rec.40).[1] Plaintiffs were represented by Rebecca Smith of Columbia Legal Services; Ryan Edgley of Halverson & Applegate, P.S. appeared on behalf of defendants.[2]

This is a class action brought by plaintiffs alleging various violations of the Migrant and Seasonal Agricultural Worker Protection Act (MSAWPA), 29 U.S.C. Section 1801 et seq. The plaintiffs, migrant agricultural workers, were employed by defendants Nolan Carlson and Cherrystone, Inc. ("Cherrystone"), during the cherry harvests of 1993 and 1994 in or around Wenatchee. The class has been defined to include:

> All migrant agricultural workers who were recruited or employed by the defendants to harvest cherries in 1993 and/or 1994 and who were provided housing by the defendants and those who may be promised or provided housing in the future.

Plaintiffs estimate there are in excess of one hundred class members.

Plaintiffs contend there is no genuine issue of material fact precluding this court from ruling as a matter of law: 1) that defendants Nolan and Rebecca Carlson owned or controlled a facility or real property used as housing for migrant agricultural workers in 1993 and 1994; 2) that defendants failed to comply in 1993 and 1994 with the substantive state and federal health and safety regulations applicable to their labor camp; and 3) that defendants operated their labor camp in 1993 and 1994 without obtaining a license.

For reasons set forth below, the court is granting the plaintiffs' request for partial summary judgment.

## I. SUMMARY JUDGMENT STANDARD

The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court. *Zweig v. Hearst Corp.*, 521 F.2d 1129 (9th Cir.), *cert. denied,* 423 U.S. 1025, 96 S.Ct. 469, 46 L.Ed.2d 399 (1975). Under Fed. R.Civ.P. 56, a party is entitled to summary judgment where the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Semegen v. Weidner,* 780 F.2d 727 (9th Cir.1985). Summary judgment is precluded if there exists a genuine dispute over

---

1. Although not styled as such, plaintiff's motion is one for partial summary judgment. The motion does not address several other claims contained in the plaintiffs' complaint.

2. Plaintiffs' motions to exceed page limitations with regard to their memorandum in support of summary judgment motion and their reply memorandum (Ct.Rec. 44 and 50) are **GRANTED.**

a fact that might affect the outcome of the suit under the governing law. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

The moving party has the initial burden to prove that no genuine issue of material fact exists. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* The party opposing summary judgment must go beyond the pleadings to designate specific facts establishing a genuine issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986).

In ruling on a motion for summary judgment, all inferences drawn from the underlying facts must be viewed in the light most favorable to the nonmovant. *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356. Nonetheless, summary judgment is required against a party who fails to make a showing sufficient to establish an essential element of a claim, even if there are genuine factual disputes regarding other elements of the claim. *Celotex,* 477 at 322–23, 106 S.Ct. at 2552–53.

## II. DISCUSSION

### A. Ownership and Control of Property

■ 29 U.S.C. Section 1823(a) provides:

[E]ach person who owns or controls a facility or real property which is used as housing for migrant agricultural workers shall be responsible for ensuring that the facility or real property complies with substantive Federal and State health and safety standards applicable to that housing.

(Emphasis added).

There is no dispute among the parties that the real property at issue was used to house migrant agricultural workers during 1993 and 1994. Furthermore, there is no dispute that Cherrystone is the owner of the property. The dispute centers on whether the Carlsons (Nolan and Rebecca) "controlled" the property during 1993 and 1994 and, as such, can be held personally responsible for compliance with safety and health standards.

Federal regulation defines the term "control." 29 C.F.R. Section 500.130(c) states:

A farm labor contractor, agricultural employer, **or any other person** is in "control" of a housing facility or real property regardless of the location of such facility, if said person is in charge of or has the power or authority to oversee, manage, superintend or administer the housing facility or real property either personally or through an authorized agent or employee, irrespective of whether compensation is paid for engaging in any of the aforesaid capacities.

(Emphasis added).

Defendants Nolan and Rebecca Carlson argue that only Cherrystone, the corporate entity, should be held responsible for compliance with safety and health standards. According to the Carlsons, only Cherrystone "provided" housing to migrant farm workers and retained the authority to manage the property through an "authorized agent or employee." The defendants assert that the intent of 29 C.F.R. Section 500.130(c) is that a corporation will be deemed in "control" of the property when exercising its authority "through an authorized agent or employee." Defendants reach this conclusion based solely on their reading of the language in the regulation. They are unable to offer any case law or legislative history in support of such an interpretation of the regulatory language.

■ The statute and the regulation make it abundantly clear that the existence of corporate ownership does not preclude a finding that individuals can be found in "control" of a housing site whether they are corporate officers, authorized agents, or employees of the corporation. The language of the statute is disjunctive—"own or control." Certainly, the corporation may technically exercise "control" through its officers, agents, or employees. However, for the purposes of the MSAWPA, this does not preclude a finding that individual officers, agents or employees also exercised "control" over the property and should be held accountable for compliance with health and safety standards. Indeed, according to the legislative history, Congress intended to give 18 U.S.C. Section

1823(a) "the broadest possible meaning to ensure that the person who owns or controls the facility used as housing for migrant agricultural workers is responsible for maintaining that facility in compliance with all substantive Federal and State safety and health standards." 1982 U.S.Code Cong. and Adm. News, pp. 4563–64.

Section 500.130(c) recognizes that a "person," (defined in 29 U.S.C. Section 1802(9) as any individual, partnership, association, joint stock company, trust, cooperative, or corporation), can "control" the property "either **personally** or through an authorized agent or employee." (Emphasis added). Furthermore, subsection (a) of the same regulation recognizes that responsibility for compliance with substantive health and safety requirements can be joint and several. It provides:

> **Each person who owns or controls** a facility or real property which is used as housing for any migrant agricultural worker must ensure that the facility or real property complies with all substantive Federal and State safety and health standards. If more than one person is involved in providing the housing for any migrant agricultural worker (for example, when an agricultural employer owns it and a farm labor contractor or any other person operates it), both persons are responsible for ensuring that the facility or real property meets the applicable Federal and State housing standards.

(Emphasis added).

The undisputed facts in this case overwhelmingly indicate that Nolan and Rebecca Carlson "controlled" the real property used for housing. Defendants admit in their statement of facts that Nolan Carlson "manages all aspects of Cherrystone, Inc.'s business (including the real property on which farm workers camped) in his capacity as Chief Executive Officer of Cherrystone, Inc." It is uncontroverted and amply supported by the record that Nolan Carlson was in charge of maintenance and repairs at the labor camp, was in charge of maintaining order in the camp in 1993 and 1994, was responsible for ensuring the camp was licensed in 1993 and 1994, was responsible for maintaining the records of Cherrystone to license the

camp, and was responsible for granting permission to stay at the camp. (Carlson Depo. at pp. 22–23, 33–35, and 73). It is uncontroverted that Nolan and Rebecca Carlson contracted to have chemical toilets installed near the camp for the 1993 and 1994 cherry harvests and also contracted to have the garbage removed. It is uncontroverted that both Carlsons instructed workers where they were permitted to camp during the 1993 and 1994 harvests. (Answers to Plaintiffs' First Set of Interrogatories Nos. 12, 14 and 15).

In *Sanchez v. Overmyer*, 891 F.Supp. 1253 (N.D.Ohio 1995), the court found that a full-time hourly employee of the owners and operators of a labor camp did not "control" migrant housing within the meaning of 29 U.S.C. Section 1823(a) where she did not have decision making authority if something needed to be corrected in the camp; made repairs only after consulting with the owners and operators; did not assign housing; and only made purchases with the approval of the owners and operators. *Id.* at 1255. In the instant case, the uncontroverted facts show that Nolan and Rebecca Carlson exercised decision making authority with regard to the labor camp. They were not mere corporate employees taking orders. They gave the orders.

The court finds as a matter of law that defendants Nolan and Rebecca Carlson "controlled" the subject real property and therefore were personally responsible for compliance with safety and health standards and for obtaining a certificate of occupancy from the Washington State Department of Health (WSDOH).

### B. Failure to Obtain License (Certificate of Occupancy)

29 U.S.C. Section 1823(b)(1) states that no person who owns or controls a facility or real property may allow said facility or property to be occupied by migrant agricultural workers unless either a State or local health authority or other appropriate agency has certified that the facility or property meets applicable health and safety standards. A copy of this certification is to be posted at the site.

Plaintiffs contend defendants did not obtain a license from WSDOH in 1993 or 1994 to operate a labor camp. Defendants **admit** that they did not procure a license for the 1994 harvest. Defendants contend they requested and paid for an inspection in 1993.

According to plaintiffs, WSDOH has no record showing that defendants received a license to operate a labor camp during 1993; has no record showing that defendants requested an inspection of a labor camp in 1993; and has no record showing defendants paid a fee to license a labor camp in 1993. Plaintiffs note that defendants are unable to produce any documentation that they requested an inspection, received a license, or paid a fee in 1993.

Nolan Carlson asserts he requested an inspection in 1993 and a fee was paid for that purpose. He also readily acknowledges that he does not have any written records (canceled checks, ledger notations, etc.) to support his claim. (Carlson Depo. at pp. 27–28). Carlson suggests that in 1993, WSDOH, during a reorganization, lost his application for an inspection.

In response, plaintiffs point out that in requests for admission previously tendered to defendants, defendants admitted they did not request an inspection for 1993. (See Appendix G to Plaintiffs' Reply Memorandum, Request No. 3). In response to another request for admission (Request No. 1), defendants admitted that an inspection was not conducted in 1993, but contended that an inspection in 1992 was also sufficient for 1993. Defendants have not advanced this argument in opposition to defendants' motion for summary judgment. In her deposition testimony, Natalie Gonzalez of WSDOH testified that a license issued in 1992 would not have been valid for two years. (Gonzalez Depo. at p. 121).

Fed.R.Civ.P. 36(b), which pertains to requests for admission, provides that "[A]ny **matter admitted under this rule is conclusively established unless the court on motion permits withdrawal or amendment of the admission.**" To date, defendants have not moved the court to withdraw or amend their admission that they did not request an inspection in 1993. Indeed, since this matter has now been submitted for the court's determination, it would appear that any motion made at this juncture is untimely.

Contrary to defendants' assertion, the deposition testimony of Natalie Gonzalez does not raise a genuine issue of material fact as to whether defendants paid for a license in 1993. Gonzalez acknowledged that WSDOH underwent a reorganization in 1993 and it was possible an application packet may have gone out to an agricultural employer without there being any record of such. According to Gonzalez, once an employer receives a packet, he completes the application and then returns it along with the fee and a water sample. Furthermore, Gonzalez testified that "[I]f any payment was received, the fiscal would not have been affected, (sic) fiscal unit within the department." Her testimony is to the effect that **if any payment had been received from the defendants,** WSDOH would have some record of it. (Gonzalez Depo., at pp. 25, 121–22).

Carlson does not contend he failed to receive an application packet. Rather, his contention is that he failed to receive an inspection despite his request for one. His testimony that he requested an inspection and paid a fee certainly suggests he received an application packet in 1993. Gonzalez states that in 1993 she was aware of only one operator from Clark County who complained that he had sent in his application but did not receive an inspection. (Gonzalez Depo. at p. 28). The court can take judicial notice that the Cherrystone camp is not located in Clark County.

■ Defendants clearly were aware of their obligation to have the labor camp licensed. They offer no explanation for their failure to license the camp in 1994. Furthermore, Carlson's testimony that he requested and paid for an inspection in 1993 is contrary to prior admissions made by the defendants and is wholly unsupported by, and indeed, inconsistent with any other evidence in the record.

■ The court finds as a matter of law that defendants "intentionally" violated the licensing requirement in both 1993 and 1994. This is a violation as to each of the class

members for the 1993 cherry harvest season and the 1994 cherry harvest season.

### C. Violations of Health and Safety Standards

#### 1. Shelter

■ Among the safety and health standards applicable to migrant labor camps are those pertaining to shelter. Defendants did not supply any shelter for the plaintiffs during the cherry harvests of 1993 and 1994. Rather, the plaintiffs supplied their own shelter. The defendants were not obligated to allow the plaintiffs to stay on the Cherrystone property. However, because the defendants did so, they were responsible for insuring that any worker-supplied shelter met applicable health and safety standards. See *Avila v. A. Sam & Sons,* 856 F.Supp. 763, 770–71 (W.D.N.Y.1994) (Housing violations found where workers slept in cars or outside on the defendants' premises).

The applicable health and safety standards are extensive. There are several sets of applicable regulations. These include the WSDOH regulations found at Washington Administrative Code (WAC) 246–358 et seq.; the Washington Industrial Safety and Health Act (WISHA) regulations pertaining to temporary labor camps found at WAC 296–24–125 et seq.; and the federal Occupational Safety and Health Act (OSHA) regulations pertaining to temporary labor camps found at 29 C.F.R. Section 1910.142.[3]

WAC 246–358–085 sets forth the obligations of an operator licensed for worker-supplied housing. Worker-supplied housing is defined as an enclosed vehicle designed for sleeping and/or living, supplied and used by a temporary worker. "Fully self-contained worker-supplied housing" means a unit with bathing, foodhandling, handwashing, and toilet facilities. "Basic worker-supplied housing" means a unit without bathing, foodhandling, handwashing, and toilet facilities. WAC 246–358–010(22).

The operator must provide a space for each worker-supplied housing unit that is located in such a manner as to prevent a health or safety hazard. The housing must be on well-drained sites to prevent standing water from becoming a nuisance and the operator must ensure that the housing site is maintained at all times in a sanitary condition free from garbage and other refuse. See WAC 246–258–045 which is incorporated into WAC 246–358–085. The operator must provide water, electricity, and sewage disposal at each space used for fully self-contained worker supplied housing. WAC 246–358–010(22)(a). The operator must provide facilities for the maximum occupancy specified on the operating license for basic worker-supplied housing, including: a) centralized bathing, handwashing, laundry, and toilet facilities; and b) common or central foodhandling facilities. WAC 246–358–085(4) expressly **prohibits the use of tents** as worker-supplied housing.[4]

Nolan Carlson states that Cherrystone has permitted workers to use tents and tarps as long as it has owned the property. Carlson acknowledges that he has allowed workers to live out of their cars. He also acknowledges that until either 1992 or 1993, he allowed workers to reside in cardboard shelters. (Carlson Depo. at pp. 21–23). Carlson admits he has allowed workers to live in tents and tarps despite his awareness of the illegality of such action. (Carlson Depo. at pp. 62 and 98). During a 1992 inspection by WSDOH, Carlson was advised in a written

---

**3.** According to plaintiffs, the regulations cited herein were effective in 1993 and 1994, the years at issue. Defendants do not dispute the applicability of any of these regulations to their labor camp.

**4.** The shelter requirements set forth by the WISHA and OSHA regulations, WAC 296–24–12503 and 29 C.F.R. 1910.142(b), do not distinguish between operator-supplied housing and worker-supplied housing, unlike WAC 246–358 et seq. (the WSDOH regulations). It appears the WISHA and OSHA shelter requirements pertain to more permanent types of shelter which are constructed at a camp site (i.e. a cabin, a dormitory, etc.) For example, there are requirements that the floor of each shelter shall be constructed of wood, asphalt, or concrete.

WAC 246–358 contemplates that something less than a permanent shelter will suffice. Worker-supplied housing is defined as an "enclosed vehicle," indicating that a camper, trailer or other recreational vehicle could be adequate under certain circumstances.

report that tents were not allowed. Carlson affixed his signature to the report. (Appendix D to Plaintiffs' Memorandum in Support of Summary Judgment). In 1994, Carlson estimates that 50 to 60 percent of the camp residents lived in tents. (Carlson Depo. at pp. 84–85).

Plaintiffs have supplied affidavits from four of the named class representatives. (Appendix C to Plaintiffs' Memorandum in Support of Summary Judgment). Elvira Rodriguez states that in 1993, she and her husband and son slept beneath a tarp tied between the branches of a tree. In 1994, they slept in a camper while other family members and friends slept beneath the tarp. Pedro Rodriguez, Elvira's husband, confirms that in 1993 his family (wife and son) slept beneath a tarp. He adds that in both 1993 and 1994, many people slept in their cars or on the ground. Saul Mayo states that in 1994 he lived in a car with three other people for about two weeks. He took turns with the others sleeping in the car and then on the ground. Mayo says other folks in the camp stayed beneath tarps or cardboard. Raul Mujica claims that during the 20 days he was at the camp during the 1994 cherry harvest, he lived under a tarp and a cardboard structure. He says there were a total of three individuals who used the tarp and the cardboard structure, while others stayed in a van.

The plaintiffs have supplied the court with photographs and a videotape which purport to depict the condition of the Cherrystone labor camp in 1994. Several of the named class representatives (Elvira Rodriguez, Pedro Rodriguez and Raul Mujica) say they have reviewed the photographs and videotape and that it is an accurate depiction of the condition of the camp in 1994. The photographs and the videotape depict a number of tents and tarps, as well as at least one cardboard structure, in the Cherrystone camp.

An affidavit from a former legal intern for Columbia Legal Services, Daniel Werner, recites that he was in the camp during July 1994 and observed at least fifty campsites in which people were staying in tents or under tarps. Werner says another thirty workers were staying in cars. (Appendix E to Plaintiffs' Memorandum in Support of Summary Judgment).

 Defendants have not presented any evidence to controvert the affidavit testimony of Elvira Rodriguez and Pedro Rodriguez that they slept beneath a tarp during the cherry harvest of 1993. Defendants do not controvert the affidavit of Saul Mayo in which he states that in 1994, he slept either in a car or on the ground. Rather, defendants suggest that if there were violations, they were not "intentional."

 Only "intentional" violations of the MSAWPA subject a defendant to liability for damages. 29 U.S.C. Section 1854(c). It is not necessary for plaintiffs to prove specific intent by defendants to violate the MSAWPA. Lack of knowledge of the MSAWPA and the necessity for compliance therewith does not preclude an "intentional" violation. "Intentional" in the context of the MSAWPA is a conscious and deliberate violation of the Act. *Bueno v. Mattner,* 829 F.2d 1380, 1385–86 (6th Cir.1987). The "intentional" requirement has been construed liberally to impose liability on individuals for the natural consequences of their acts. *Id.* at 1386 citing *Rivera v. Adams Packing Ass'n,* 707 F.2d 1278, 1283 (11th Cir.1983).

With regard to the Rodriguez family, there is no genuine issue of material fact that defendants "intentionally" violated substantive health and safety standards in 1993 by allowing the family (husband, wife and son) to sleep beneath a tarp.[5] Nolan Carlson admits he knew workers were sleeping under tarps and that this was illegal. Carlson also admits that he knew people were sleeping in their cars and that this activity was illegal. As such, there is also a violation with regard to Saul Mayo's living situation during the 1994 harvest.

 With regard to Raul Mujica, defendants claim that the cardboard structure (cardboard tepee) was constructed at the end of the cherry harvest and when observed by Nolan Carlson and an agent from WSDOH (Natalie Gonzalez), both believed the struc-

---

**5.** This would constitute at least three separate statutory violations—one per each individual.

ture was not being used. Carlson indicates he was aware of the cardboard structure and investigated it a couple of times "after work," which was approximately around 4 p.m. (Carlson Depo. at 76–77). He claims he did not tear it down because it was so near the end of the cherry harvest and he did not think anybody was living in it.

Natalie Gonzalez states that during an inspection of the camp, apparently in July 1994, she noticed one cardboard structure. At one point in her deposition, she states that it was not being used and that "[T]here was no one in it." (Gonzalez Depo. at p. 72). However, later in her deposition, Gonzalez adds that to the best of her recollection, someone was using it for "sleeping purposes." (Gonzalez Depo. at p. 130, Appendix D to Reply Memorandum).

The fact that Carlson allowed the cardboard structure to remain standing discredits his assertion that no one was staying in the cardboard tepee. He knew that such structures were not allowed in a labor camp. He had in "past years" allowed workers to stay in cardboard shelters. (Carlson Depo. at p. 25). Carlson does not indicate if and how he would have known if someone was simply overnighting in the structure. It would not be unusual if there was no one around the structure at 4 p.m. The photographs and videotape of the structure reveal what appears to be an old mattress lying on the ground, as well as what appear to be some clothing hanging from the structure.

The defendants have not controverted the affidavit testimony of Raul Mujica that he slept in the cardboard structure. With regard to Mujica, the defendants intentionally violated substantive safety and health standards in 1994. There is no genuine issue of material fact with regard to the violation.[6]

■ There is no doubt that a substantial number of the residents of the labor camp in 1993 and 1994 stayed in tents. Defendants argue that the use of tents during the summers of 1993 and 1994 is not a violation of "substantive" health and safety standards.[7] "Substantive" violations are ones which "in any way endanger the health or safety of the migrant agricultural worker or his or her family." 1982 U.S.Code Cong. and Adm. News, p. 4564. Defendants claim that if anything, the presence of tents at the Cherrystone camp in 1993 and 1994 was a technical violation.

Defendants cite an Opinion Letter from the U.S. Department of Labor, dated April 2, 1993, which states that where there is not strict compliance with the OSHA standard and the deviation from strict compliance does not affect the employees' safety and health, the deviation will be considered "technical." Factors considered in this determination include the nature of any hazard created by the deviation, the extent of such deviation, the extent to which the deviation was readily apparent, and the length of occupancy at the camp site.

Defendants claim that testimony from WSDOH personnel supports their argument that tents can generally be used during the summer cherry harvest without creating an appreciable safety or health risk. Defendants seem to suggest that because of the time of year (summer) of the cherry harvest and its limited duration, there is no health or safety risk presented by the use of tents. Defendants also submit that the plaintiffs have not presented evidence of specific uses of tents which constitute substantive health or safety risks. Furthermore, defendants argue plaintiffs have not presented evidence that tents at the camp were "uniform in their characteristics."

Natalie Gonzalez indicates that in 1995, the WSDOH adopted a provisional licensing program allowing operators to use tents. Gonzalez testified that "[T]he use of a tent as we have requested in the provisional licensing program for the Department of Health would not put someone at a appreciable risk, or we would not be allowing it." (Gonzalez Depo. at p. 118). According to Gonzalez, the provisional program was implemented because of

---

6. The extent of Mujica's damages is a different question and certainly the length of his stay in the cardboard structure is relevant to that question.

7. Defendants make no such claim with regard to "tarps" which the parties clearly distinguish from "tents."

an acute lack of farmworker housing in Washington and to assure that even if workers stayed in a tent camp, they would still have access to potable water, toilet facilities, garbage pickup and security. (Gonzalez Depo. at p. 108). Gonzales also acknowledged, however, that the health risks in a tent camp were greater than those in a "full compliance" camp. (Gonzalez Dep. at p. 109).

The court is not persuaded by defendants' assertion that the prohibition on the use of tents is not a "substantive" health and safety standard. The WSDOH provisional program did not exist in either 1993 or 1994, the years at issue in the instant case. WSDOH regulations prohibited the use of tents at that time and the defendants clearly knew as much. Nolan Carlson acknowledges that prior to 1995, he did not receive anything from the state indicating it was okay for him to house workers in tents. (Carlson Dep. at 130). Secondly, the statement from Gonzalez notes there is an increased health risk from allowing workers to reside in tents.

Plaintiffs have submitted an affidavit of Ione Adams, M.D. (Appendix B to Reply Memorandum). Dr. Adams is a family practitioner. Forty percent of her patients are migrant or seasonal farmworkers. Dr. Adams indicates that tents without flooring, and which cannot be screened, do not offer protection from rodents and insects which may cause discomfort and disease. 29 C.F.R. Section 500.133 defines substantive safety and health standards to include "reasonable protections for inhabitants from rodents and insects." Dr. Adams also suggests that inadequate shelter would not sufficiently protect camp residents from extreme heat, dusty conditions, and wind. Furthermore, adequate ventilation might be a problem with some types of shelter.

 Based on the foregoing, the court concludes as a matter of law that defendants intentionally violated the MSAWPA with regard to each plaintiff who slept in a tent at defendants' labor camp in 1993 or 1994. The amount of damages to which each of these plaintiffs may be entitled, is a question for the trier of fact. The photographs and videotape suggest there may have been some variation in the quality of the tents used at the camp. This is relevant to the question of damages, as may be the defendants' receipt of a provisional license to use tents in 1995.

The record indicates that some of the class members may have stayed in campers, trailers, or recreational vehicles during the 1993 and 1994 harvests. The Rodriguez family stayed in a camper during the 1994 harvest. Under certain circumstances, these vehicles may constitute adequate worker-supplied housing. A jury will have to take such evidence into account in determining the extent of damages. (See discussion in "Summary," infra ).

### 2. Cooking and Foodhandling Requirements

 In conjunction with "basic worker-supplied housing," an operator (i.e. the person or persons responsible for temporary worker housing) must provide common or central foodhandling facilities. A "common" facility is an area designated by the operator for occupants to store, prepare, cook and eat their own supplies. A "central" facility is a cafeteria type eating place with food furnished by and prepared under the direction of the operator without charge to the occupants. WAC 246–358–010(10)(a) and (b).

WAC 246–358–125(2) indicates what is to be included in a common foodhandling facility: a) a room or building separate from and convenient to dwelling units, dormitories and spaces; b) an operable cook stove or hot plate with a minimum of one cooking surface for every two adult occupants or four cooking surfaces for every two families; c) sinks with hot and cold running water under pressure; d) food storage areas with easily cleanable food preparation counters situated off of the floor; e) mechanical refrigeration; f) tables and chairs; g) fire resistant, non-absorbent, non-asbestos, and easily cleanable wall coverings adjacent to cooking areas; h) non-absorbent, easily cleanable floors; and i) no direct openings to living or sleeping areas from the common foodhandling facility. Some of the same requirements apply to "central" facilities. A "central" facility must also meet all

the WAC requirements pertaining to food service.

The affidavits of the named class representatives clearly indicate that there was not a common or central foodhandling facility at the Cherrystone labor camp in either 1993 or 1994. For example, Saul Mayo and Raul Mujica state that they did not have a refrigerator and that they built a fire in order to cook food. The Rodriguez family brought their own refrigerator, a cooler, a hot plate, and a table. Defendants concede that each of the occupants provided their own cooking and foodhandling facilities.

In their written submissions to the court, defendants did not contest that the WSDOH cooking and foodhandling regulations are "substantive" in nature. At oral argument, however, counsel for defendants seemed to suggest otherwise. Counsel referred to deposition testimony from Natalie Gonzalez. The record before this court indicates Gonzalez testified cooking non-refrigerated food would not remove all of the risks posed by non-refrigeration. According to Gonzalez, cooking can remove the risk of food-borne illness for a period of time, but if the food is cooked and left out again, there will be a renewed risk. (Gonzalez Depo. at p. 125).

The affidavit of Dr. Adams clearly points out the health risks of non-refrigeration. Dr. Adams indicates that coolers are an inadequate substitute. According to her, it is difficult to assure an adequate temperature within coolers for safe food storage because of frequent opening in hot outside temperatures. Furthermore, unlike mechanical refrigeration, ice must be replenished frequently. Melted ice can impact the quality of stored food and increase the likelihood of

germs spreading among the food. Dr. Adams also points out the obvious hazards of food stored out in the open (access by rodents and insects), as well as cooking over open fires (risk of burns, risk of fire in windy and dry conditions).

The WAC regulations requiring common or central foodhandling facilities, and specifying the standards for such facilities, are clearly intended to alleviate the health risks testified to by Natalie Gonzalez and Dr. Adams. The regulations are "substantive" health and safety standards.

 There is no genuine issue of material fact that defendants "intentionally" violated these substantive health and safety standards.[8] Even if defendants did not know of the requirement of a common or central cooking and foodhandling facility, they did know workers were supplying their own cooking and foodhandling facilities. As such, the court finds as a matter of law that there has been a violation in this regard as to all class members who had "basic worker-supplied housing" at the Cherrystone camp in 1993 and 1994.[9]

3. Sanitary Condition of Camp—Garbage and Standing Water

 An operator of temporary worker housing must ensure at all times that the housing site is maintained in a sanitary condition free from garbage and other refuse. WAC 246-358-045(2). The operator is also obligated to prevent standing water from becoming a nuisance. 246-358-045(1)(b). WAC 296-24-12501(1) and (3) (WISHA) and 29 C.F.R. § 1910.142(a)(1) and (3) (OSHA) contain similar provisions. Defendants do

8. Plaintiffs also assert violations of WISHA and OSHA regulations. Because there is a clearly established violation of the WSDOH regulation, as set forth above, it is not critical that plaintiffs also prove a violation of the WISHA and OSHA regulations. In any event, the court has some question about the applicability of the WISHA regulation (WAC 296-24-12503(10)) and the OSHA regulation (29 C.F.R. Section 1910.142(b)(10)) which state that "[I]n camps where cooking facilities are used in common, stoves (in ratio of one stove to 10 persons or one stove to two families) shall be provided in an enclosed and screened shelter." In the instant case, cooking facilities were not used in com-

mon. It does not appear that "common" cooking facilities are mandated under WISHA and OSHA regulations, unlike WSDOH regulations which do mandate such facilities where there is "basic worker-supplied housing."

9. Under the WAC, defendants were not obligated to provide a common or central foodhandling facility to occupants of "fully self-contained housing." This would apply to any camp residents with trailers or recreational vehicles having adequate bathing, foodhandling, handwashing, and toilet facilities.

not dispute that these are "substantive" health and safety standards.[10]

Plaintiffs contend that in 1993 and 1994, trash was scattered throughout the Cherrystone camp and garbage receptacles were overflowing. Plaintiff's evidence includes the photographs and the videotape, as well as affidavits from the named class representatives. The photographs and the videotape do indeed depict overflowing receptacles and garbage strewn about the camp. Pedro Rodriguez states there were three garbage receptacles in the camp in both 1993 and 1994 and that they would rapidly overfill with garbage scattering throughout the camp. While she was at the camp during the 1994 inspection, Natalie Gonzalez noticed two garbage receptacles which, according to her, were "to the point of overflowing." (Gonzalez Depo. at p. 77).

The written results of the WSDOH inspection conducted in July 1994 note the following violations: refuse on the grounds and standing water. (Appendix D to Plaintiffs' Memorandum in Support of Summary Judgment). Elvira Rodriguez and Raul Mujica indicate there was a problem with standing water beneath the water spigots located in the camp. The photographs confirm as much. Daniel Werner states that in the summer of 1994, he observed standing water under the camp's spigots, in addition to observing trash in the camp and trash overflowing from the garbage receptacles. (Appendix E to Plaintiffs' Memorandum in Support of Summary Judgment).

Defendants maintain they made efforts to remove trash and litter and that they cleaned up the trash and the litter "when necessary." Defendants note deposition testimony of Gonzalez that the garbage receptacles were located sufficiently far enough from the camp so as not to present a "hazard" to the camp residents. (Gonzalez Depo. at p. 77). Gonzalez stated she was informed that in 1994, garbage was being picked up weekly from the camp by a waste management company.

Gonzalez indicated this would be adequate, depending on whether there were enough containers in the camp.[11] (Gonzalez Depo. at pp. 125–26).

Defendants acknowledge there was a problem with water and mud developing under one of the spigots located in the camp, but that they corrected it immediately after being advised of it. Indeed, Jack Strop of WSDOH, who inspected the camp in 1994, states in his deposition that the problem was rectified immediately. (Strop Depo. at pp. 62–63).

The defendants do not dispute the affidavit testimony of plaintiffs that there was garbage strewn about the camp, that there was a problem with the garbage receptacles overflowing, and that there was a problem with standing water under at least one of the spigots located in the camp. Defendants do not assert that the camp residents were somehow responsible for there being garbage strewn about the camp and standing water under the spigots. Defendants do not offer any detail as to how often Cherrystone employees would pick up garbage in the camp. They do not indicate why they might have thought they had an adequate number of garbage receptacles relative to the camp population.

The defendants do not claim ignorance of camp conditions and indeed, they would be hard pressed to make such a claim. As noted above, Nolan Carlson acknowledged that he was in charge of maintenance and repairs at the labor camp. Carlson also stated in deposition testimony that he was in the camp "almost daily" in 1994. (Carlson Depo. at p. 33 and p. 69). Furthermore, when corrective action was finally taken by the defendants, it was at the direction of WSDOH inspectors.

Based on the evidence presented, the court finds as a matter of law that in 1993 and 1994, with respect to all the members of the

---

10. Indeed, the Department of Labor Opinion Letter on which defendants rely indicates that OSHA's policy has been to permit little deviation from the terms of site-related requirements that directly affect the safety and health of workers, such as drainage and refuse disposal.

11. Applicable regulations require refuse containers to be emptied at least twice a week and when full. WAC 246–358–155(b); WAC 296–24–12515(3); 29 C.F.R. Section 1910.142(h)(3).

plaintiff class, there was an intentional violation of the health and safety standards pertaining to refuse disposal and standing water. Any efforts made by Cherrystone to alleviate refuse disposal and standing water problems are relevant to the damages issue to be considered by the trier of fact.

### 4. Lighting

 WAC 246–358–115(3) requires an operator of temporary worker housing to provide "adequate outdoor lighting for safe passage within the housing area." According to plaintiffs, the only light provided at the camp in 1993 and 1994 was a PUD floodlight located at one end of the one to two acre camp site. Defendants do not dispute that this is the only light they provided for the entire camp. Defendants do not dispute that lighting regulations are "substantive" health and safety standards.

In his affidavit, Saul Mayo indicates that there was "almost no light in the camp at night" and that the only light came from a "street light" located near a roadway at the entrance to the camp. Raul Mujica echoes that statement in his affidavit. The Rodriguez family state that they brought their own light bulbs and extension cords along with them. Daniel Werner claims that in 1994, there were extension cords running through the camp and that some of the cords were laid on the ground in the path of vehicles

entering and leaving the camp. Werner says he noticed that some of the camp residents hung the cords in trees and used them to provide electricity for the light bulbs they had brought along with them. Mujica states he noticed some of the extension cords were close to standing water located beneath some of the spigots in the camp.

Defendants assert that the PUD light installed by them was approved by the WSDOH in 1992 as providing adequate lighting for the camp. However, as the plaintiffs correctly point out, that simply is not what WSDOH Inspector Strop testified to. Strop stated that Cherrystone had installed lighting by 1992, but he did not venture any opinion as to its adequacy. (Strop Depo. at p. 23). The defendants do not controvert any of the affidavit testimony presented by the plaintiffs concerning the lack of adequate outdoor lighting and the need for camp residents to provide their own lighting.

The court finds that defendants intentionally violated the substantive health and safety standards pertaining to adequate outdoor lighting in 1993 and 1994.[12] This is a violation as to each member of the plaintiff class during those years.[13]

## III. SUMMARY

There is an absence of any issue of material fact that the Carlsons "controlled" the

---

12. In the case of "basic" worker-supplied housing, an operator is generally obligated to provide centralized bathing, handwashing, laundry, and toilet facilities. WAC 246–358–085(3)(a). An operator is required to provide centralized laundry facilities unless commercial or public laundry facilities are within three miles of housing and accessible to occupants. WAC 246–358–095(4). It is not clear that defendants had such centralized facilities at their camp. If they did, they were obligated to "provide lighting in toilet rooms twenty four hours a day." WAC 146–358–095(2)(h). If the PUD light was all that was supplied by the defendants, it appears there would be a violation of this regulation.

Plaintiffs also cite to WISHA and OSHA regulations pertaining to lighting. The court questions the extent to which these regulations are applicable when worker-supplied housing is involved. WAC 294–24–12513 and 29 C.F.R. Section 1910.142(g) state that where electric service is available, each habitable room in the camp shall be provided with certain types of light fix-

tures and electrical outlets. Worker-supplied housing includes "enclosed vehicles," rather than "habitable rooms." Is an operator required to provide light fixtures and outlets for recreational vehicles? The same regulations require certain light fixtures and light levels for toilet rooms and therefore, appear somewhat duplicative of the WSDOH regulations.

13. In a footnote, the plaintiffs state the evidence concerning extension cords running through the camp "appears" to be a violation of the requirement that the operator of a labor camp prevent the creation of a health or safety hazard. WAC 246–358–045(2). Defendants counter that the July 1994 inspection report by WSDOH stated nothing about any electrical hazards at the camp. There is uncontroverted evidence of extension cords running throughout the camp, which certainly would seem to create a potential electrical hazard. However, having already found a violation of section 1823(a), it is not necessary for the court to determine whether there is an absence of a genuine issue of material fact in this regard.

labor camp, thereby making themselves personally responsible for ensuring that there was compliance with substantive safety and health standards. There is an absence of any issue of material fact that the defendants (Cherrystone and the Carlsons) failed to have the labor camp certified for occupancy by the appropriate State health authority in 1993 and 1994. This is a violation of 29 U.S.C. Section 1823(b)(1). It is a violation as to each and every member of the class for both 1993 and 1994.

There is an absence of any issue of material fact that in both 1993 and 1994, defendants' labor camp was in violation of safety and health standards pertaining to sanitation (garbage and standing water), lighting, shelter, cooking and foodhandling. With regard to the sanitation and lighting standards, there was a violation as to each class member for both 1993 and 1994. Because some of the class members may have had adequate "fully self-contained worker supplied housing" in either 1993 or 1994, the court cannot find there was a class-wide violation with regard to those health and safety standards. Nonetheless, because there is at least one class-wide violation of section 1823(a) in both 1993 and 1994, the only issue left for the trier of fact is amount of damages to be awarded to each of the class members. If the shelter or cooking facility requirements were also violated in regard to certain of the class members, the jury can consider this in determining the total amount of actual or statutory damages due to each of them.

29 U.S.C. Section 1854(c) provides:

If the court finds that the respondent has intentionally violated any provision of this chapter or any regulation under this chapter, it may award damages up to and including an amount equal to the amount of actual damages, or statutory damages of up to $500 per plaintiff per violation, or equitable relief, except that (A) multiple infractions of a single provision of this chapter or of regulations under this chap-

ter shall constitute only one violation for purposes of determining the amount of statutory damages due a plaintiff; and (B) if such complaint is certified as a class action, the court shall award no more than the lesser of up to $500 per plaintiff per violation, or up to $500,000 or other equitable relief.

(Emphasis added).

■■■■ Any combination of violations of the shelter, cooking, sanitation, and lighting regulations constitutes only one violation of section 1823(a) for the purpose of determining the amount of statutory damages. In accord is *Sanchez v. Overmyer*, 891 F.Supp. at 1260 (multiple infractions of section 1823(a) including unsanitary shower and handwashing facilities, unsanitary toilet facilities, overcrowded living accommodations, insufficient number of beds, lack of heat, and inadequate trash removal, were considered as one violation). Also in accord is *Howard v. Malcolm*, 658 F.Supp. 423 (E.D.N.C.1987) (award of $500 per plaintiff for violation of section 1823(a) which included inadequate cooking facilities, garbage cans without tops, lack of hot water, unsanitary food storage and preparation areas, etc.).

With respect to named plaintiffs Elvira Rodriguez, Pedro Rodriguez and their son, the shelter and cooking facility requirements were violated as to each of them in 1993.[14] A jury may consider this in assessing the total amount of actual or statutory damages due to each of the Rodriguez family members for 1993. The shelter and cooking facility requirements were violated in 1994 as to Saul Mayo and Raul Mujica. A jury may consider this in assessing the total amount of actual or statutory damages due to them for the 1994 harvest season. Any of the class members who had adequate "fully self-contained" housing in 1993 or 1994 probably will not have suffered a violation of the shelter or cooking facility requirements.[15]

**14.** At oral argument, plaintiffs' counsel indicated the Rodriguez family stayed in nothing more than a camper shell during the 1994 harvest. This may not constitute adequate fully self-contained housing. If so, there would be violations of the shelter and cooking/foodhandling require-

ments with regard to the Rodriguez family for 1994.

**15.** Pursuant to WAC 246-358-085, an operator must provide water, electricity and sewage disposal at each space used for fully self-contained

■ The failure to obtain a housing license pursuant to 29 U.S.C. Section 1823(b)(1) is separate and distinct from a violation of section 1823(a) for the purpose of calculating statutory damages. Thus, plaintiffs are entitled to statutory damages for violation of section 1823(b)(1) **in addition** to violations of section 1823(a). The subsections set forth separate and distinct obligations. Section 1823(b)(1) recognizes such because it states that "[T]he receipt and posting of a certificate of occupancy does not relieve any person of responsibilities under [section 1823(a) ]." Consistent therewith is *Howard v. Malcolm,* cited *supra,* in which the court awarded $100 per plaintiff for a violation of section 1823(b) (failure to obtain certificate of occupancy), in addition to the $500 per plaintiff for violation of section 1823(a).

■ The 1993 and 1994 cherry harvest seasons may be treated as separate for the purpose of calculating the total number of statutory violations committed by defendants. Separate statutory damages may be awarded for similar MSAWPA violations occurring in successive vegetable seasons, provided the seasons constitute distinct and separate transactions. *Rivera v. Adams Packing Ass'n,* 707 F.2d 1278, 1283 (11th Cir.1983) (a case arising under the Farm Labor Contractor Registration Act, the predecessor to MSAWPA); *Leach v. Johnston,* 812 F.Supp. 1198, 1211, 1212 (M.D.Fla.1992).

## IV. ORDER

Plaintiffs' motion for partial summary judgment (Ct.Rec. 40) is **GRANTED** to the extent set forth above.

**IT IS SO ORDERED.**

' worker supplied housing. The record does not permit the court to conclude whether or not defendants complied with those requirements.