Elroy **RENTERIA–MARIN.** et al., Plaintiffs,

v.

**AG–MART PRODUCE, INC.,** et al., Defendants.

Marino **Perez–Alvino,** et al., Plaintiffs,

v.

**Ag–Mart Produce, Inc. and Green Stripe, Inc.,** Defendants.

Nos. 3:01–CV–1392–J–25MCR, 3:02–CV–627–J–25MCR.

United States District Court, M.D. Florida, Jacksonville Division.

May 14, 2007.

Gregory S. Schell and JoNel Newman, Migrant Farmworker Justice Project, Lake Worth, FL, for Plaintiffs.

David J. Stefany and Brian Koji of Allen, Norton & Blue, Tampa, FL, for the Defendants.

### ORDER

ADAMS, District Judge.

Based upon the testimony and evidence received at trial, and the applicable legal standards, the Court makes the following findings of fact and conclusions of law:

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

1. These cases concern housing facilities occupied by agricultural laborers employed by Defendant Ag–Mart Produce. Inc. at its farm near Jennings. Florida. The Plaintiffs filed two separate actions, one addressing the 2001 growing season (Case 3:01–cv–1392), with the other relating to the 2002 season (Case 3:02–cv–627). Classes were certified under F.R.C.P. 23(b)(3) of all migrant farmworker employees of the Defendants who resided during those seasons in any one of three specified commercial motels. (Dkt. 21. Case 3:01–cv–1392 and Dkt. 21, Case 3:02–cv–627). On its own motion, the Court consolidated these two cases. (Dkt. 12. Case 3:01–cv–1392 and Dkts. 28 and 36, Case 3:02–cv–627).

2. The consolidated case was tried on May 17 and 18, 2004. Eight witnesses testified at the trial—two representatives of Defendant Ag–Mart Produce, Inc. (Donald G. Long and Warrick Birdwell), two individuals involved with the housing accommodations of Ag–Mart employees during the 2001 and 2002 harvest seasons (Ajay Gandhi and Lyn Morris), and four members of the certified class (Magdalena Garcia–Vasquez, Angel Marino–Vasquez,

Lucia Martinez–Mejia and Manuel Torres–Castañeda). The Court also received documentary evidence and deposition testimony from a number of other witnesses. After the parties failed to reach a settlement post-trial. the Court allowed the parties to re-argue their respective positions on June 16, 2006.

### FINDINGS OF FACT

3. Defendant Ag–Mart Produce. Inc. (Ag–Mart) is a major producer of grape tomatoes. Ag–Mart currently grows grape tomatoes in southwest Florida, central Florida, north Florida, North Carolina and New Jersey, Ag–Mart is owned by Defendant Green Stripe, Inc. Long[1] at 4.

4. Ag–Mart has been growing grape tomatoes in northern Florida, near Jennings, since 1998. In recent years, grape tomatoes have been harvested on Ag–Mart's north Florida farm in both the spring and fall. Long at 5–6. Approximately 500–600 workers are hired to harvest the grape tomato crop on Ag–Mart's north Florida farm. Long at 6; Birdwell at 8–9.

5. In 2001 and 2002, the harvest workers were recruited and transported to the Jennings area by farm labor contractors, or "crew leaders." The crew leaders ordinarily brought their crews to Ag–Mart's north Florida farm after finishing work at the company's other locations. Birdwell at 8–9. During the relevant time period, Agmart hired nine farm labor contractors, DX 2–5.

6. The crew leaders were paid commission and some received a draw (a wage check reducing the amount of the commission) after submitting a time card. Long

---

**1.** Citations to trial testimony will include the witness last name and trial transcript page. Citations to deposition testimony will include the abbreviation "Depo." and may also include the exhibit number of the deposition. Exhibits will be referred to as either PX (Plaintiffs' exhibit) or DX (Defendants' exhibit) followed by the relevant number.

at 12, 51–52: PX 35, Depo. Sandi Phillips at 23, 42. The crew leaders were not directed to fill out a time card for time spent performing housing duties. Long at 49.

7. It is customary for farms or crew leaders to supply housing to migrant workers employed in short-term harvests. PX 16, Depo. Jose Flores–Guzman at 31. The relevant area has limited rental housing, and many local landlords were unwilling to rent to migrant crews. Birdwell at 10.

8. Mr. Gandhi, the owner of a small motel in nearby Jasper, Florida, provided some rooms at his own motel for Ag–Mart employees. Beginning in 2000, Mr. Gandhi began to procure rooms at other motels in the area for occupancy by Ag–Mart's harvest workers. Gandhi at 5–6, 10; Birdwell at 10–12. Through his company, CKG Group. Inc., Mr. Gandhi negotiated reduced room rates with the motels and then billed Ag–Mart at a higher rate for the rooms. Gandhi at 6–8.

9. Ag–Mart investigated the cost of constructing and operating a traditional migrant labor camp near its north Florida farm but elected to continue its practice of arranging for its workers to stay in local motels and subsidizing the rental costs rather than making the substantial capital investment needed to build a labor camp. Long at 7–8, 28.

10. In the 2001 and 2002 seasons, Mr. Gandhi, operating as CKG Group, provided accommodations to Ag–Mart employees at his own Motel 8 in Jasper and at two motels owned by Hospitality Investments, Inc.—the Howard Johnson in Jennings and the Best Western in Lake Park, Georgia. Gandhi at 6–7: Dkt. 65. Joint Pretrial Statement. Item 9(c), (d) and (e). Mr. Gandhi paid Hospitality Investments $25 plus tax per night per room in 2001, and in turn charged Ag–Mart $34.95 per night for each room. Gandhi at 51; Dkt. 65. Joint Pretrial Statement, Item 9(a);

DX 2, 2001 invoices from CKG Group to Ag–Mart; DX 8, letter agreement between Hospitality Investments and CKG Group, January 8, 2001. For the 2002 harvest season. Mr. Gandhi paid Hospitality Investments $26.00 per night for each room and billed Ag–Mart $35.95 per room. Gandhi at 54; Dkt. 65. Joint Pretrial Statement, Item 9(b); DX 4, DX 5 and DX 6, 2002 invoices from CKG Group to Ag–Mart; DX 17, letter agreement between Hospitality Investments and CKG Group, January 12, 2002.

11. Mr. Gandhi had 14 rooms available for occupancy by guests at the Motel 8. The Howard Johnson had 120 rooms, while the Best Western had 60 rooms. Gandhi at 4–5; Morris at 44; DX 38, Depo. Sebastian Daniels at 10; DX 40, Depo. Tina McDaniel at 32. As the Ag–Mart employees came into the area for the start of the harvest. Mr. Gandhi first filled the rooms at Motel 8. After these 14 rooms were filled, he assigned Ag–Mart workers to the Howard Johnson. If additional rooms were needed beyond those available at the Howard Johnson, Mr. Gandhi used rooms at the Best Western. Gandhi at 22–24.

12. At times during both the 2001 and 2002 the harvest seasons, but for the owner's family, Motel 8 was leased and occupied entirely by Ag–Mart employees. Gandhi at 24, 85. Ag–Mart employees also accounted for a substantial majority of the guests at the Howard Johnson motel during the harvest seasons. PX 58. Daily report, Howard Johnson Jennings, July 28, 2001 (Ag–Mart rented 72 percent –59 of 82–of the rooms occupied on that date).

13. On July 23, 2001, as an example, 61 percent of the rooms at the Howard Johnson were occupied, whereas a year earlier, the occupancy rate was only seven percent. Morris at 6–8; PX 37, Motel manager's report, July 23, 2001.

14. Farm manager Warrick Birdwell informed the crew leaders that in order to obtain housing for their crews, they should notify Mr. Gandhi as they prepared to depart for the north Florida harvest. PX 14, Depo. Laurencio Rodriguez at 12–13; PX 15, Depo. Sergio Salinas at 15–16, 19, 42; PX 34, Depo. Rafael Montes at 25. Either Mr. Birdwell or the crew leaders informed Mr. Gandhi as to the number of workers in each crew and their anticipated arrival dates in north Florida. Gandhi at 21: PX 14. Depo. Rodriguez at 15, 42; PX 15, Depo. Sergio Salinas at 16, 20; PX 34, Depo. Rafael Montes at 25, 113, Mr. Gandhi then arranged with the motels to provide the crews with the necessary number of rooms upon arrival. Gandhi at 8. 22; DX 40, Depo. Tina McDaniel at 16–17; PX 15, Depo. Sergio Salinas at 20. Ordinarily, Mr. Gandhi would meet the crews when they arrived at the motel to ensure that registration and check-in proceeded smoothly. Gandhi at 25; DX 40, Depo. McDaniel, at 16–17; PX 15, Depo. Salinas at 20; PX 34. Depo. Montes at 16.

15. The motel rooms were generally registered under the names of the crew leaders and Mr. Gandhi, rather than under the names of the individual employees.[2] Gandhi at 41; Morris at 9; DX 40, Depo. McDaniel, at 12–13, 17: PX 15, Depo. Salinas at 22–23: PX 16, Depo. Jose Flores–Guzman at 19, 23, 36, 41. In 2002, the Howard Johnson recorded the room occupants' names. Morris at 46–47. Because of the advance arrangement between Mr. Gandhi and the motels' owners, the crew leaders were not required to pay in ad-vance or provide a credit card to guarantee payment at the time of check-in. PX 14, Depo. Rodriguez at 45–46; PX 16, Depo. Flores–Guzman at 21, 23; PX 34, Depo. Montes at 24; DX 40; Depo. McDaniel at 12–13.

16. The motels issued the room keys to the crew leaders, rather than to the individual workers. PX 15, Depo. Salinas at 20; PX 16, Depo. Flores–Guzman at 20; PX 34, Depo. Montes at 20. The crew leaders then distributed the room keys to the workers. PX 15, Depo. Salinas at 22; PX 18, Depo. Maceda Bravo at 5; PX 26, Depo. Gonzalez–Lopez at 7; PX 28, Depo. Carabajal Geronimo at 6; PX 29, Depo. Palma–Zuniga at 6; PX 30, Depo. Carabajal–Geronimo at 5; PX 31, Depo. Meza–Jimenez at 6.

17. The Ag–Mart harvest workers were assigned to rooms in the motel by the crew leaders. Morris at 46: Marino–Vasquez at 6; Martinez–Mejia at 4; PX 17, Lopez–Arroyo at 6; PX 19, Depo. Garcia at 6–7; PX 20, Depo. Flores–Maldonado at 6–7; PX 23, Depo. MezaCruz at 6; PX 24, Depo. Rueda at 6–7; PX 26, Depo. Gonzalez–Lopez at 6; PX 28, Depo. Carbajal–Geronimo at 6; PX 29, Depo. Palma–Zuniga at 5; PX 30, Depo. Carabajal–Geronimo at 5; PX 31, Depo. Meza–Jimenez at 6.

18. The crew leaders were billed for room keys lost by the members of their respective crews; the crew leaders sometimes decided that only a few of the occupants of each room would be given keys and then selected the guests to whom the limited keys would be issued. PX 34.

---

2. The Court's Findings of Fact contain numerous general findings regarding the relevant issues. These general findings are in no way to be construed as applicable to every Ag–Mart worker at all times in each and every motel during the relevant period.

Some, but certainly not all, exceptions to the general findings are noted in the relevant numbered paragraphs.

The Court makes several findings based upon Ms. Morris's trial testimony and Ms. McDaniel's deposition testimony to illustrate the involvement of the crew leaders with the motels.

Both Ms. McDaniel and Ms. Morris testified regarding their employment at the Howard Johnson motel; the motel housed the majority of the relevant workers.

Depo. Montes at 159–161; PX 24; Depo. Rueda at 7, 20. If workers lost a room key, the crew leaders sometimes determined whether a replacement key would be requested, with the corresponding charge assessed against the crew leader. PX 34. Depo. Montes at 162.

19. Mr. Gandhi billed Ag–Mart on a weekly basis for the number of rooms occupied by its employees. Gandhi at 9, 17. The invoices, issued by CKG Group, broke down the number of rooms used by members of each of Ag–Mart's crews during the billing period. Gandhi at 19; DX 2, 3, 4 and 5, 2001 and 2002 invoices from CKG Group to Ag–Mart. The invoices were sent to Mr. Birdwell, Ag–Mart's farm manager, for his review. Mr. Birdwell checked that the dates were correct and that the crew leaders listed were in fact employed by Ag–Mart. If the invoice was correct. Mr. Birdwell forwarded it to Ag–Mart's administrative office in Plant City, Florida for payment. Birdwell at 13–14; Gandhi at 8; Long at 29–30.

20. Ag–Mart paid the majority of the rental charges for the rooms at the three motels during the 2001 and 2002 north Florida harvests. For example, in 2001, it paid $144.65 of the weekly room cost of $244.65. Long at 9–10. The company's total rental expenses ran into six figures per year. Long at 21. Had it not subsidized the workers' rent. Ag–Mart probably would not have been able to procure and retain the workforce it needed to harvest the north Florida crop. Long at 56–57.

21. It was Ag–Mart's policy to collect $100 per week in rent from the employees residing in each motel room. If less than $100 per room was collected, Ag–Mart recouped the resulting shortfall from the crew leader whose crew members resided in the room. Long at 9–11; PX 34. Depo. Montes at 30–31, 142; PX 35, Depo. Phillips at 34, 44.

22. It was Ag–Mart's plan that each employee occupying one of the motel rooms be charged $25 per week for rent. This figure was included in a written disclosure Ag–Mart prepared for distribution to the harvest workers in accordance with the Migrant and Seasonal Agricultural Worker Protection Act. 29 U.S.C. § 1821(a). DX 1, Disclosure on Department of Labor Form WH–516 (stating that housing would be provided at a "local motel" at a rate of "$25 per week.") Before departing for north Florida, Ag–Mart's crew leaders informed the workers they recruited of the $25 per week rental charge for the motel accommodations. Marino–Vazquez at 16; PX 14, Depo. Rodriguez at 11,13; PX 16, Depo. Flores–Guzman at 16–17, 36; PX 17, Depo. Lopez–Arroyo at 6; PX 18, Depo. Maceda Bravo at 5, 11; PX 29, Depo. Palma–Zuniga at 10–11.

23. There was trial testimony produced that Ag–Mart's north Florida farm manager directed the crew leaders to assign four employees to each motel room, the maximum number of guests per room allowed at the Howard Johnson and the Best Western. PX 14, Depo. Rodriguez at 21; DX 38, Depo. Daniels at 87: DX 40, Depo. McDaniel at 54–55. However, Ag–Mart's Senior Executive Vice–President testified that he did not direct the crew leaders or Mr. Gandhi to assign four occupants per room. Long at 8. Howard Johnson would occasionally permit an additional guest if a rollaway bed was available. Morris at 37–38 (testifying, *inter alia*, that she prefers not to rent to more than four people and this policy was strictly enforced when possible)

24. To build a "cushion" against rent collection shortfalls, some crew leaders assigned five or more workers to a room, forcing some of the workers to sleep on the floor. Martinez–Mejia at 4; PX 34,

Depo. Montes at 34, 43, 104–05, 116, 178; PX 19. Depo. Garcia at 6–7; PX 24, Depo. Rueda at 6–7, 18–19; PX 26, Depo. Gonzalez–Lopez at 6.

25. The motel management gave the crew leaders full access to "their" rooms, even issuing one crew leader a master key for the entire motel. Morris at 44–45 (testifying that Mr. Montes "forced" her to give him a master key); DX 40, Depo. McDaniel at 71–72; PX 34, Depo. Montes at 53–54, 97, 189–90. This allowed the crew leaders to regularly check the number of occupants in each room. Marino–Vasquez at 7; Martinez–Mejia at 5; Garcia–Vasquez at 4; PX 18, Depo. Maceda–Bravo at 5; PX 20, Depo. Flores–Maldonado at 7, 12; PX 21, Depo. Galvez–Ortega at 10; PX 23, Depo. Meza Cruz at 8; PX 28, Depo. Carabajal–Geronimo at 6; PX 29, Depo. Palma–Zuniga at 6; PX 30. Depo. Luis Carabajal–Geronimo at 5; PX 31, Depo. Meza–Jimenez at 6–7; PX 34, Depo. Montes at 52–54. When a crew leader discovered that a worker had left, he would direct other crew members to move into the room and fill the vacancy. Marino–Vasquez at 7; Martinez–Mejia at 5; DX 40, Depo. McDaniel at 96; PX 17, Depo. Lopez Arroyo at 7–8; PX 20, Depo. Flores–Maldonado at 7, 12; PX 21, Depo. Galvez–Ortega at 10; PX 29, Depo. Palma–Zuniga at 6; PX 31, Depo. Meza–Jimenez at 7; PX 34, Depo. Montes at 43. One motel employee testified that the crew leaders also moved the workers from room to room "all the time" because some did not get along. Depo. McDaniel at 96.

26. Although the written disclosures stated that the rent was $25 per week, some workers were charged a higher rate, up to $100 per week. DX 21, DX 22, DX 23, DX 24, DX 25 and DX 27, worker time cards; PX 35, Depo. Phillips at 51–58. As a result of the rent deductions, some workers received no net wages whatsoever for a workweek. DX 23. Time cards for Juan Pena, Mcche Hernandez, Fidel M. Castro and Antonio Castro, August 16, 2002; DX 26, Time cards for Julio Nave Diaz, Daniel Bautista Roberto and Ignacio Maurilio. November 29, 2002. Defendant produced testimony that clerical errors regarding rent were rectified. Long at 35–38; DX 28.

27. The crew leaders were expected to be in charge of their group, and as such were responsible for the behavior of the members of their respective crews while on the motel property. Morris at 19–24 and 35; Gandhi at 33–34. The motels requested that the crew leaders or one of their lieutenants occupy a room next to the rooms occupied by their crew. Morris at 18, 23.

28. One of the motels required the crew leaders to execute a "hotel waiver" setting out their responsibilities in this regard. Among other things, the crew leaders agreed that "as the crewleader in charge . . .*we are responsible for the conduct of our group* and any damages that may or may not incur with this [crew]." (emphasis added). The crew leaders also agreed to ensure that any rooms vacated by their crews were left "empty and clean." with the crew leaders subject to an additional charge if the room was left excessively dirty. Morris at 28; DX 12. Hotel Waivers.

29. The "hotel waivers" also obligated the crew leaders to complete a daily "in house crew sheet." DX 12, Hotel Waivers; DX 40, Depo. McDaniel at 38–39. The "in house crew sheet" listed the rooms that the motel believed were occupied by the members of each respective crew on a given day. The crew leaders were asked to review the form for accuracy with regard to their respective crews. DX 12, Hotel Waivers; DX 40, Depo. McDaniel at 39. These daily room count forms were part of the motel's administrative billing

process. Gandhi at 28–30; Morris at 26–27; PX 34. Depo. Montes at 68. The room count forms were also used by Mr. Gandhi to prepare the CKG Group invoices to Ag–Mart for the rental costs. Gandhi at 18, 88. The motel management prepared and Mr. Gandhi posted a notice reminding Ag–Mart's crew leaders of their responsibility to complete these forms on a daily basis. Morris at 26–27; Gandhi at 28–29; PX 1, Notice regarding room counts. In addition, Mr. Birdwell. Ag–Mart's north Florida farm manager, told at least one crew leader that proper completion of the in house crew sheets was part of his job responsibilities. PX 34, Depo. Montes at 72–73, 76.

30. Often, if the motel management had concerns regarding the behavior of certain Ag–Mart employees, the workers' crew leader would be contacted. If this contact did not resolve the underlying problem, the motel management would contact Mr. Gandhi and ask him to intercede with the crew leader. If problems continued after he became involved, Mr. Gandhi would contact Mr. Birdwell. PX 34, Depo. Montes at 82, 95. Mr. Birdwell mediated these disputes and usually urged the crew leaders to work with Mr. Gandhi to resolve any problems identified by the motel management. PX 34, Depo. Montes at 72, 197, Mr. Birdwell was the direct supervisor of the crew leaders: his intervention ordinarily resulted in the crew leaders attempting to resolve the concerns previously raised by the motel management and Mr. Gandhi. PX 34, Depo. Montes at 83 (testifying that Mr. Birdwell told him "we weren't going to have a job" if the motel housing became unavailable).

31. The names and room numbers of the crew leaders were posted at the motel front desk for the convenience of the management staff. Morris at 35 (stating the crew leaders were expected to "supervise" but not "police" their workers). The motel management viewed the crew leaders as responsible for the behavior of the members of their crew and expected that they would speak with the workers and take any actions necessary to correct any misbehavior. Morris at 19–20, 22; PX 15, Depo. Salinas at 31.

32. In 2003, one of the motels refused to allow two of Ag–Mart's crew leaders to house his crew at the facility because the crew leader had failed to sufficiently control his crew during prior harvests. Morris at 39–40.

33. The motel management often relied on the crew leaders to serve as liaisons between the English-speaking motel staff and the Spanish-speaking Ag–Mart employees. PX 34, Depo. Montes at 85; DX 40, Depo. McDaniel at 37–38. Sometimes the motel staff first attempted to communicate directly with the individual. Morris at 19–20. The crew leaders helped enforce the motel's rules and policies, causing one crew leader to liken his role to that of a building superintendent in an apartment complex. PX 34, Depo. Montes at 85–86 and 153–54; PX 34; Morris at 19. However. Ag–Mart did not provide any of the motel's occupancy rules. Long at 31–33; Ghandi at 58–59 and 78–79.

34. When there was a noise problem, the motel management staff often contacted the crew leader whose workers were responsible. Morris at 20: Gandhi at 35–36; DX 40, Depo. McDaniel at 66–68, 118 (testifying she would go to the room first and then to the the the crew leader if she was unsuccessful); PX 15, Depo. Salinas at 42; PX 24, Depo. Rueda at 21; PX 34, Depo. Montes at 39–40, 108. On occasion, the crew leaders addressed problems of excess noise by reassigning the rowdy workers to rooms in the back area of the motel, away from other guests. PX 34, Depo. Montes at 194–95.

35. One of the motels imposed a curfew on the farmworkers. PX 34, Depo. Montes at 85, 199. While in place, the curfew was enforced by the crew leaders. PX 26, Depo. Gonzalez–Lopez at 8.

36. The motels also relied on the crew leaders to see that the facility's maximum occupancy levels were not exceeded in the individual rooms, and that there was no overcrowding. Gandhi at 39, 42–43. If overcrowding was discovered, it was the responsibility of the crew leaders to remove some of the room occupants and assign them to another room. Gandhi at 43 and 77.

37. For a period of time, one of the motels required the farmworkers to place their shoes outside of their rooms, so that dirt would not be tracked into the rooms. PX 14, Depo. Rodriguez at 35; PX 34. Depo. Montes at 36. 85–88, 200. The crew leaders monitored the rooms of their crew members and if they did not see sufficient pairs of shoes outside the door of a room, they spoke to the occupants and reminded them of the motel rule. PX 14. Depo. Rodriguez at 35–36, 50; PX 15, Depo. Salinas at 50; PX 18. Depo. Maceda Bravo at 7, 11–12; PX 20, Depo. Flores–Maldonado at 5; PX 21, Depo. Galvez–Ortega at 8, 14; PX 29. Depo. Palma–Zuniga at 7–8; PX 30, Depo. Carabajal–Geronimo at 12; PX 31, Depo. Meza–Jimenez at 7.

38. Several of the workers purchased small gas grills. The motels allowed the workers to cook on these grills, provided they were used outside, and at a safe distance from the building. DX40, Depo. McDaniel at 36; PX 14, Depo. Rodriguez at 58; PX Depo. Flores–Guzman at 59. The crew leaders monitored the workers' compliance with this rule: when workers were found cooking in their rooms or too close to the buildings, the crew leaders told them to relocate the grills and informed them that if they failed to do so, cooking privileges could be revoked. PX

14, Depo. Rodriguez at 59; PX 15, Depo. Salinas at 35–37; PX 16. Depo. Flores–Guzman at 62, 64–66; PX 34. Depo. Montes at 94–95.

39. When excessive amounts of trash accumulated at the motels. the management would notify the crew leaders and ask them to see that the trash was picked up. Gandhi at 37–38. When a state inspector cited Motel 8 for excessive trash accumulation, the crew leader whose workers occupied the motel assigned members of his crew to help collect the garbage. Gandhi at 89–90. If a crew leader was unsuccessful in persuading workers to pick up the trash, the crew leader would sometimes direct his field walkers or supervisors to clean up the refuse. PX 15, Depo. Salinas at 39–42.

40. On some occasions. the crew leaders ordered the farmworkers to clean the rooms or the common areas themselves. PX 20, Depo. Flores–Maldonado at 5; PX 23. Depo. Meza Cruz at 9; PX 26, Depo. Gonzalez–Lopez at 7.

41. The motels also sometimes depended on the crew leaders to relay incoming telephone calls directed to members of their respective crews. When a phone call was received for one of the Ag–Mart workers, the front desk staff would transfer it to one of the crew leaders, hoping that he would locate the individual worker to whom the call was directed. Morris at 47.

42. In addition to billing him for the rooms occupied by the Ag–Mart employees, the motels also charged Mr. Gandhi for any excessive damage to the rooms by the migrant worker guests. Morris at 42–43: Gandhi at 9, Mr. Gandhi expected Ag–Mart and the crew leaders to reimburse him for these charges. Sometimes he approached the crew leader whose crew members occupied the damaged room and asked him to pay for the repairs. Gandhi at 13–14; PX 15, Depo. Salinas at 32–33;

PX 34, Depo. Montes at 56–57. In these cases, the crew leader would speak with the workers, attempt to identify the perpetrators and collect the repair costs from them. Gandhi at 80; PX 16. Depo. Flores–Guzman at 51–52; PX 34, Depo. Montes at 57–58, 191. If the crew leader failed to pay for the repairs. Mr. Gandhi billed the expenses to Ag–Mart, providing the company with the name of the crew leader whose crew members had occupied the room in which the damage had occurred. Ag–Mart usually attempted to recoup damage expenses through deductions from the wages of the workers responsible for the damage, provided they could be identified, or by assessing the charge against the crew leader overseeing the crew. Long at 19, 22, 47–48; PX 34, Depo. Montes at 192; PX 35, Depo. Phillips at 38; DX 25, Check stub reflecting damage charges assessed against employees; PX 10, Check stub reflecting charge against crew leader. Ag–Mart deducted the charge if he received an authorization signature from the relevant employee. Long at 34: Phillips at 14 –15. Sometimes, Mr. Gandhi repaired the damage. Gandhi at 14. Sometimes, CKG absorbed miscellaneous costs. Gandhi at 13–16, 53; 35, Depo. Montes at 57.

43. Prior to occupancy by Ag–Mart's employees during the 2001 and 2002 north Florida grape tomato seasons, none of the motels were certified by either a State or local health authority or other appropriate agency as meeting safety and health standards applicable to migrant labor camp housing. Dkt. 65, Joint Pretrial Statement, Item 9(g).

44. In neither 2001 nor 2002 did Ag–Mart post in a conspicuous place at the motels or present to its employees a written statement of the terms and conditions of occupancy of the motels. Dkt. 65, Joint Pretrial Statement, Item 9(h).

45. Three double beds were placed in the rooms at Motel 8. while each room at the Howard Johnson and the Best Western had two double beds. Gandhi 26–27; PX 14, Depo. Rodriguez at 21; PX 15, Depo. Salinas at 21. Because of the number of workers assigned to each room. it was not uncommon for workers to be assigned to share a motel room and sometimes a bed with strangers. PX 23, Depo. Meza Cruz at 22; PX 26, Depo. Gonzalez–Lopez at 24–25. Sometimes workers were forced to share a room with non-family members of the opposite sex, with all of them using common toilet and shower facilities. Marino–Vasquez at 6–7; Martinez–Mejia at 10; PX 18. Depo. Maceda Bravo at 5; PX 24, Depo. Rueda at 6–7; PX 34. Depo. Montes at 21. Although some workers complained about these housing arrangements, the situation continued unabated. PX 34, Depo. Montes at 29.

46. There generally were no cooking facilities provided by the motels for the use of the workers. Gandhi at 32–33; Marino–Vasquez at 8; Martinez–Mejia at 5; PX 14, Torres–Castaneda at 8; Garcia–Vasquez at 5; DX 40, Depo. McDaniel at 74–75; PX 14, Depo. Rodriguez at 25; PX 16, Depo. Flores–Guzman at 38; PX 17, Depo. Lopez–Arroyo at 10; PX 18, Depo. Maceda Bravo at 8; PX 23, Depo. Meza Cruz at 10; PX 24, Depo. Rueda at 8–9; PX 26, Depo. Gonzalez–Lopez at 9; PX 28. Depo. Carabajal–Geronimo at 7; PX 29, Depo. Palma–Zuniga at 8–9; PX 30. Depo. Luis Carabajal–Geronimo at 7; PX 34, Depo. Montes at 39. However, Defendants produced testimony that the Best Western had a small kitchen available. Daniels at 29.

47. While residing in the motels, many Ag–Mart employees did not have regular access to a refrigerator. Marino–Vasquez at 8–9; Martinez–Mejia at 5; DX 40,

Depo. McDaniel at 74 (testifying that refrigerators were not provided but that some workers brought their own); PX 14, Depo. Rodriguez at 67; PX 15, Depo. Salinas at 47; PX 16. Depo. Flores–Guzman at 38–39, 77; PX 23, Depo. Meza Cruz at 11; PX 26, Depo. Gonzalez–Lopez at 10; PX 28, Depo. Carabajal–Geronimo at 10; PX 29, Depo. Palma–Zuniga at 9; PX 30, Depo. Luis Carabajal–Geronimo at 7; PX 31, Depo. Meza–Jimenez at 11. Defendants did produce testimony that the Howard Johnson had an unlocked "golf room" that contained refrigerators and stoves. Morris at 42. However, a crew leader testified that the appliances were not designed for crew use. Rodriguez at 68. At one point the same crew leader stated that while refrigerators were available, because they were in an unlocked room and people loitered in the area, food may be stolen. Rodriguez at 72–74.

48. Because they generally lacked access to cooking facilities and refrigerators, workers purchased their meals from mobile food wagons set up in the parking lots of the motels. PX 17, Depo. Lopez–Arroyo at 10; PX 24, Depo. Rueda at 9; PX 26, Depo. Gonzalez–Lopez at 9; PX 30, Depo. Carabajal–Geronimo at 7; PX 6. Photograph of lunch wagons in Howard Johnson parking lot. The wagons sold meals to the motel guests at a rate of $6 per meal ($5 for the food and $1 for a soda). Marino–Vazquez at 9; Garcia Vasquez at 6; PX 24, Depo. Rueda at 9; PX 30, Depo. Luis Carabajal–Geronimo at 7.

49. In order to economize, most of the workers would have preferred to prepare their own meals. PX 18, Depo. Maceda Bravo at 8; PX 23, Depo. Meza Cruz at 10; PX 24, Depo. Rueda at 23; PX 26, Depo. Gonzalez–Lopez at 9; PX 28, Depo. Carabajal–Geronimo at 9; PX 29, Depo. Palma–Zuniga at 9; PX 30, Depo. Luis Carabajal–Geronimo at 7; PX 31, Depo. Meza–Jimenez at 11. Due to the lack of cooking facilities at the motels, some of the Ag–Mart employees testified that they ended up paying $18 per day for meals from the wagons. Marino–Vasquez at 9; Martinez–Mejia at 6. Torres–Castaneda at 4; PX 26, Depo. Gonzalez–Lopez at 10. Some of the Plaintiffs testified that this amount was considerably more than the workers would have spent had they been able to prepare and cook their own meals. Garcia Vasquez at 6 (prepared own meals at other locations at a cost of $20 per week); Marino–Vasquez at 9 ($40 per week for two individuals); Torres-Castañeda; Martinez–Mejia at 6 ($60 per week for two persons); PX 18, Depo. Maceda Bravo at 8–9 ($25 per week for a single person); PX 24, Depo. Rueda at 9–10 ($80 to $90 per week for six persons).

50. The motels were not equipped with sufficient laundry facilities available for use by the Ag–Mart employees. PX 16, Depo. Flores–Guzman at 82. Ms. McDaniel testified that the Howard Johnson had one coin operated washer and dryer. McDaniel Depo. at 75. Ms. Morris testified that there were two washers and dryers. Morris at 44.

51. One crew leader testified that fifteen of his workers lived in housing other than the motels. Rodriguez at 53–54. However, evidently these workers already lived in town when they contacted the relevant crew leader looking for work. *Id.* at 53.

52. Although Ag–Mart was aware of laws regulating migrant farmworker housing, it elected not to have the motel rooms inspected and licensed because of the company's belief that commercial motels are automatically exempt from these laws, Long at 23. Ag–Mart never sought an opinion from the United States Department of Labor as to whether the motel rooms it rented from Mr. Gandhi were exempt from the Act's housing require-

ments. *Id.* Mr. Long testified that he sought advice on the issue from an employee at the Florida Fruit and Vegetable Association's labor department. *Id.*

### CONCLUSIONS OF LAW

 During the period they were employed on Ag–Mart's north Florida operations in 2001 or 2002, the members of the class were migrant agricultural workers within the meaning of the Migrant and Seasonal Agricultural Worker Protection Act (Act), 29 U.S.C. § 1802(8)(A). The Defendants are agricultural employers within the meaning of the Act. 29 U.S.C. § 1802(2).

The Act imposes several obligations on each person who owns or controls real property used as housing for migrant agricultural workers. First, prior to occupancy by the workers, the facility must be certified by a health department or other appropriate agency as satisfying applicable state and federal health and safety standards. 29 U.S.C. § 1823(b)(1). Once the facility is occupied, it must continue to meet these same safety and health standards. 29 U.S.C. § 1823(a). In addition, any agricultural employer which provides housing to its migrant workers is required to post in a conspicuous place or furnish to the workers a written statement of certain occupancy terms and conditions. 29 U.S.C. § 1821(c).

The Defendants' liability in this case turns on whether they "controlled" and also whether they "provided" the motel rooms in which their crews were housed during the 2001 and 2002 north Florida harvests. There is no question that the Defendants did not own the motel rooms.[3] If the Defendants controlled the rooms, they were responsible for seeing that there was a pre-occupancy certification and once

the crews moved in and the rooms complied with the applicable safety and health standards. Also. to the extent that they "provided" this housing to the members of the class, the Defendants were required by the Act to post the terms and conditions of occupancy.

 Because it is a remedial statute, the Court is required to construe the Act broadly to effectuate its humanitarian purposes. *Morante–Navarro v. T & Y Pine Straw, Inc.,* 350 F.3d 1163, 1166 (11th Cir. 2003); *Caro–Galvan v. Curtis Richardson, Inc.,* 993 F.2d 1500, 1505 (11th Cir.1993). Further, the legislative history of the Act reveals an express Congressional intent that the Act's housing provisions be applied expansively. *Castillo v. Case Farms of Ohio, Inc.,* 96 F.Supp.2d 578, 614 (W.D.Tex.1999); *Rodriguez v. Carlson,* 943 F.Supp. 1263, 1267–68 (E.D.Wash.1996):

> While the Committee is aware that some agricultural workers are housed in safe and healthy circumstances, the Committee is also well aware of the deplorable conditions in which migrant workers are often housed. The Committee intends that [29 U.S.C. § 1823] be interpreted with the broadest possible meaning to ensure that the person who owns or controls the facility used as housing for ·migrant agricultural workers and their families is responsible for maintaining that facility in compliance with all substantive Federal and State safety and health standards.

*H.R. 97–885, 97th Cong., 2d Sess,* at 17–18, 1982 U.S.Code & Adm. News 4563–64.

Under the regulations implementing the Act, an agricultural employer "controls" a housing facility if it "is in charge of or has the power to oversee, manage, superintend or administer the housing facility ... either personally or through an authorized

---

**3.** Because they are not in the business of providing housing on a commercial basis to the general public, the Defendants do not qualify for the so-called "innkeeper exemption" to the Act's housing requirements, 29 U.S.C. § 1823(c).

agent or employee ..." 29 C.F.R. § 500.130(c). This is an expansive definition; as one district court observed, "[i]t is immediately clear that the term 'controls' is intended to include broad-ranging activities. The disjunctive phrase—'authority to oversee, manage, superintend or administer' housing—sweeps in more activities than those traditionally relegated to a landlord." *Castillo,* 96 F.Supp.2d at 614. Thus, the Court must analyze whether Ag–Mart had sufficient power to oversee, manage, superintend or administer the motels.[4]

■ As a threshold issue, Defendants argue that neither CKG, Mr. Ghandi, nor the crew leaders were Ag–Mart's agents *for housing purposes.*[5] Defendants also contend that "there was no evidence introduced at trial indicating Ag–Mart itself, by its words or conduct, ever led the farm-

workers to believe that the contractors acted on its behalf with respect to overseeing the facilities of the commercial motels ....[n]either CKG Group or Gandhi possessed actual or apparent authority to operate on behalf of Ag–Mart with respect to overseeing the motels..."[6]

Plaintiffs note that contractors in similar cases were found to be the employer's agent. Further, as noted by other Courts. the Act envisions joint employment when determining liability: "[the Act's] statutory framework was created in part, to address the all too common problem of agricultural employers evading legal liability for mistreatment of workers by the insertion of a farm labor contractor between the main employer and the worker." *Castillo,* 96 F.Supp.2d at 590 n. 11 (internal citations omitted).[7]

---

**4.** The same type of inquiry is used to determine whether a grower has the power to control farmworkers so as to be subject to the Act's requirements. 62 Fed.Reg. 11.739 (1997); *Charles v. Burton,* 169 F.3d 1322, 1329 (11th Cir.1999), *rehearing denied,* 182 F.3d 938, *cert. denied* 528 U.S. 879, 120 S.Ct. 191, 145 L.Ed.2d 160 (1999) (noting that the question is "whether the agricultural employer has the power, either alone or through the [farm labor contractor], to direct, control or supervise the workers...").

**5.** Because the Parties do not extensively discuss whether either Mr. Gandhi or CKG Group were Ag–Mart's agents for housing, the Court declines to make a finding on this issue.

**6.** Defendants proffer testimony to demonstrate that the contractors did not submit time cards for hours spent performing housing-related functions and argue that Ag–Mart did not compensate any contractor for performing these functions. Long at 49. However, whether or not Defendants paid the crew leaders a draw from commission for housing activities is not determinative of the agency question.

A[n] ... agricultural employer ... is in "control" of a housing facility or real property, regardless of the location of such facility, if said person is in charge of or has the power

or authority to oversee, manage, superintend or administer the housing facility or real property whether personally or through an authorized agent or employee, *irrespective of whether compensation is paid* for engaging in any of the aforesaid capacities.

29 C.F.R. § 500.130(c) (emphasis added).

**7.**

It is not entirely clear whether the joint employment doctrine applies in this case: the Court notes the doctrine simply to illustrate Congress's concerns regarding liability evasion. One Court noted in 2000 that, "[t]he court's research has revealed no case in which the joint employer doctrine was applied where the agricultural employer admitted that it employed the plaintiff workers, .......reliance on the joint employer doctrine is unnecessary and would be inappropriate. If the [employer is] to be held liable for the acts of [the crewleader] it must be under a different theory."
*Cardenas,* 2000 WL 1372848 at *6 (S.D.Ind. 2000).

The Court ultimately concluded that the crew leader was the farm's general agent. *Id.* at *9.

Even accepting Defendants' position that it did not pay the crew leaders for housing duties, clearly Ag–Mart authorized the crew

The Court notes that Ag–Mart clearly authorized the contractors to house the workers at the motels and made arrangements regarding same. As noted previously, there was also testimony produced that Ag–Mart's north Florida farm manager directed the crew leaders to assign four employees to each motel room, told at least one crew leader that proper completion of the in house crew sheets was part of his job responsibilities. and sometimes mediated disputes regarding the motels.

The Court finds that the crew leaders were acting as the Defendants' agents in their oversight of the housing. Further, in this case both Ag–Mart and the crew leaders were involved in housing responsibilities. Thus, the Court must simply determine if Ag–Mart and/or its crew leader agents exerted the requisite degree of control over the motels.

■ Defendants, while not conceding it controlled the housing, clearly did subsidize it. As Defendants notes. courts have held that merely arranging and paying for housing is not equivalent to overseeing, managing, superintending or administering the housing. *Cardenas,* 2000 WL 1372848 at 15 (fact that the employer arranged and paid for the workers' motel rooms insufficient to demonstrate control); *Castillo,* 96 F.Supp.2d at 618–19 (insufficient "control" where the grower's involvement with the housing was limited to arranging for the housing, negotiating leases and advancing rent and deposits.) [8]

While it appears that procuring and subsidizing housing. without more, is insufficient to demonstrate control of that housing, it factors into the Court's control analysis.

The *Castillo* decision provides an extensive discussion of "control" of farmworker housing within the meaning of the Act. In *Castillo,* one of the employer's contractors located and arranged for housing for various groups of farmworker employees over a two-year period. The employer was held to have "controlled" the housing occupied by the workers during the first year because the contractor was "deeply involved" in the management of the housing. *Id.* at 615. The contractor assigned workers to their quarters, paid the first months' rent, helped the landlord collect delinquent rent payments from the workers and signed the workers rent receipts. *Id.* Thus, the court found it "abundantly clear" that the grower controlled the housing. *Id.* The court. however, found that the employer did not "control" the housing occupied by the workers during the second year; the contractor paid the first month's rent, but lacked the authority to assign workers to apartments or to determine the amount of their rent and did not have keys to the units. *Id.* at 619.

In *Rodriguez v. Carlson,* 943 F.Supp. 1263 (E.D.Wash.1996), the court found Plaintiffs "overwhelmingly" demonstrated that a grower "controlled" a makeshift labor camp of tents and campers because, *inter alia.* he was responsible for making

---

leaders to house the workers in the hotels and deal with CKG/Gandhi and the motel management. There is no evidence of record that the crew leaders exceeded that authority.

**8.** Defendants note that *Cardenas* is the only case that addresses control of a commercial hotel. Evidently, the *Cardenas* case involved three Plaintiff families who stayed in three rooms at a Knights Inn for a single season. *Id.* at *1.

The Court noted that it was "undisputed . . . .that neither [the farm employer]. . . . had any influence or authority over the operation, management or administration of the [motel]." *Id.* at *14. The Court held that arranging and paying for the motels was insufficient to demonstrate the requisite degree of control. *Id.*

repairs, licensing, maintaining order, and assigning workers locations where they could camp. *Id.* at 1268. The Court noted that the Defendants had decision making authority. *Id.*

In *Cardenas,* while the grower arranged for the rooms and subsidized the workers' quarters in a motel, the grower had no authority over the operation, management or administration of the motel. *Cardenas v. Benter Farms,* 2000 WL 1372848 at *14.

Similarly, in another case, a contractor did not control housing where she made only minor repairs and maintained supplies: she lacked the authority to. *inter alia.* assign workers to quarters in the camp. *Sanchez v. Overmyer,* 891 F.Supp. 1253, 1255–1258 (N.D.Ohio 1995).

█ In sum, these decisions suggest that "control" over housing requires something more than subsidizing a room or making minor repairs. As to whether the authority to assign workers to specific rooms or sites is one of the primary indicators of a defendant's "control" over a facility, the Court notes that this authority was lacking in both *Cardenas* and *Sanchez,* Indeed, in explaining its ruling, the court in *Sanchez* made an express finding regarding the defendant's lack of this power. *Id.* at 1255.

Defendants argue that Ag–Mart did not impose terms or conditions of occupancy upon the workers. In *Castillo,* the court held that it is not necessary for a defendant to acquire ultimate authority over the property in order to "control" it. *Castillo,* 96 F.Supp.2d at 614. On the other hand, in *Sanchez,* the court emphasized that the defendant contractor lacked ultimate authority over the camp in part because the growers, who owned the camp, had the final say regarding repairs. 891 F.Supp. at 1255.

The Court finds the *Castillo* reasoning persuasive. Limiting responsibility for housing conditions to those who have ulti-mate authority over the housing is inconsistent with Congress' expressed intent that the housing provisions be broadly applied. Furthermore, such a rule would often result in a single person or entity being responsible for compliance with the Act's housing requirements which is inconsistent with the regulations; the regulations specifically provide for situations of shared responsibility regarding compliance. 29 C.F.R. § 500.130(a).

█ The Defendants have also suggested that the regulatory definition only applies to control over a physical structure, rather than the power to regulate the activities of the facilities' occupants. The Defendants point to the regulatory definition's reference to the authority to oversee, manage or administer "a housing facility," rather than the power to regulate the activities of the tenants. The Court rejects the Defendants' reading of the regulation as inconsistent with both the legislative history of the Act and prior case law. To limit the Act's responsibilities to those who manage the physical structure would place an undue emphasis on a defendant's maintenance and repair of the building itself. Instead of giving the term "the broadest possible meaning," as Congress directed, this interpretation would greatly narrow the class of persons responsible for ensuring adequate housing for migrant farmworkers.

Further, as Plaintiffs argue, it would make little sense for the regulation to include the terms "manage" and "administer" if the only activity covered was oversight of the physical facility. "Management" and "administration" imply decisions relating to the occupants of the housing. such as assigning tenants to specific rooms or sites. The crew leaders' general lack of decision making authority is not determinative of control as Defendant suggests.

Finally, such a narrow reading of the phrase would be inconsistent with prior decisions in which defendants were found to "control" housing based on their oversight of the occupants, rather than the physical structure. *Castillo; Walcher v. Donovan,* 1982 WL 1990 (D.S.C.1982) (decided under the Act's predecessor statute, the Farm Labor Contractor Registration Act). These decisions discuss the importance of a defendant's power to, *inter alia,* assign workers to specific rooms and to establish the amount of their rent, neither of which have anything to do with the management of the physical structure of the housing.

*Caro–Galvan v. Curtis Richardson, Inc.,* 993 F.2d 1500 (11th Cir.1993), while not on point for the issue currently before the Court, directs Courts to construe the Act broadly and consider the economic realities of the housing. As noted, the Act's "prime purpose [is] protecting agricultural workers from exploitive conditions" and thus the Act's housing provisions apply when the housing conditions are "so closely related to the terms or circumstances... [of] employment." *Id.* at 1511. This Eleventh Circuit decision discusses situations where the employment makes accepting the housing a "practical necessity." *Id.* In the instant case, while a few workers evidently lived in housing other than the motels in question, it is clear that accepting accommodations at the relevant motels was a practical necessity for almost all of Defendants' farm labor workers. As noted by Plaintiffs, without the motels' availability, Defendants would have been unable to retain its workforce unless it invested in a traditional labor camp.

Reviewing this case in its totality, the preponderance of the evidence demonstrates that during the 2001 and 2002 grape tomato harvests, the Defendants "controlled" the accommodations of their employees at the three motels within the meaning of the Act. Indeed, the Defendants' actions in this case exceeded those which caused the court in *Castillo* to conclude that the employer was "deeply involved" in the workers' housing. *Castillo,* 96 F.Supp.2d at 615. Here, while the motels generally promulgated the rules, the contractors did more act as translators: the contractors often acted as rule enforcers.

Of course because Defendants "controlled" the motel rooms, they were required to have them certified as meeting both Florida [9] and federal migrant labor housing standards prior to occupancy by the class members. 29 U.S.C. § 1823(b)(1). The Defendants concede that this was not done.

Although the motels were inspected and licensed as public lodging establishments, this did not mean that the facilities met federal and state migrant housing codes. The standards for public accommodations differ substantially from those for migrant farmworker housing, where ordinarily the occupants reside for an extended period of time. For example, migrant labor camps must be equipped with cooking facilities and provide occupants with a designated minimum amount of floor space in their sleeping quarters, 29 C.F.R. § 1910.142(b)(2); Florida Administrative Code § 64E–14.017. No similar obligations are imposed on motels, which usually cater to short-term guests.

The accommodations provided to the Ag–Mart employees at the motels fell short of applicable migrant labor housing standards in a number of respects. Of particular importance was the general lack

---

**9.** As noted by Defendants. the motels do not qualify as migrant labor camps under Florida law. Fla. Stat. Sections 381.008. *et seq.* However, this does not mean that the motels are exempt from Florida's migrant housing laws.

of cooking facilities and refrigerators in the motels. Florida law requires that all migrant labor housing be equipped with stoves and refrigerators. Florida Administrative Code § 64E–14.017. In addition, facilities for washing and drying clothes were not provided, as required by federal regulations, 29 C.F.R. § 1910.142(f)(1) and (5). Also, several problems stemmed from the overcrowding of rooms and assignment of unrelated men and women together in single rooms. Separate toilet and shower facilities for each sex were not provided in those rooms to which unrelated men and women were assigned. Florida Administrative Code § 64E–14.015(3) and 29 C.F.R. § 1910.142(d)(4). In some rooms, there were insufficient beds and workers were forced to sleep on the floor, in violation of Florida and federal law. Florida Administrative Code § 64E–14.018(1) and 29 C.F.R. § 1910.142(b)(3).

The Act also requires any agricultural employer which "provides" housing to migrant workers post in a conspicuous place the terms and conditions of occupancy. 29 U.S.C. § 1821(c). The Defendants acknowledge that they did not make the required posting of housing terms; the notices regarding motel rules posted by Mr. Gandhi lacked some of the data required to be included pursuant to the Act and its implementing regulations, 29 C.F.R. § 500.75(f).

Of note, while Section 1823(a) is applicable to any person who *owns* or *controls* a facility or real property used as housing for migrant agricultural workers, Section 1821(c) requires only that an agricultural employer *provide* housing for any migrant agricultural worker. *Cardenas,* 2000 WL 1372848, at *15 ("in drafting the [Act], Congress employed the more restrictive phrase 'owns or controls' in § 1823(a) which governs compliance with safety and health standards. whereas, it employed the broader phrase 'provides housing' in § 1821(c) which imposes posting and notice requirements upon housing providers").

In sum, the term "provide" is considerably broader than "own" or "control," so that an employer may violate the posting requirements without "controlling" the housing. *Castillo,* 96 F.Supp.2d at 621–22. Because Defendant clearly provided Plaintiffs' housing at the motels, the Court finds Defendants liable for violations of both Section 1823(b)(1) and Section 1821(c).

In order for a farmworker to recover damages in a private action under the Act. the violations of the Act must be "intentional," 29 U.S.C. § 1854(c)(1). Under the Act, the common civil standard of intent is utilized, holding a person liable for the natural consequences of his or her acts. *Wales v. Jack M. Berry, Inc.,* 192 F.Supp.2d 1291, 1303 (M.D.Fla.2000); *Campbell v. Miller,* 836 F.Supp. 827, 830 (M.D.Fla.1993). No specific intent to violate the law need be shown. *Campbell* at 830; *Bueno v. Mattner,* 829 F.2d 1380, 1385–86 (6th Cir.1987), *cert. denied,* 486 U.S. 1022, 108 S.Ct. 1994, 100 L.Ed.2d 226 (1988). In cases where violations occur as a part of a defendant's normal business practices, no further showing of intent is required. *Stewart v. Everett,* 804 F.Supp. 1494, 1498 (M.D.Fla.1992); *Osias v. Marc,* 700 F.Supp. 842, 844 (D.Md.1988).

Ag–Mart's violations of the Act were "intentional" within the meaning of the Act. In this case, Ag–Mart deliberately decided to house its crews in the motels. As noted, Ag–Mart management elected not to have the motel rooms inspected and licensed because of the company's belief that commercial motels are automatically exempt from the Act.

Furthermore, the violations occurred as part of the Defendants' regular business practices and were not the result of isolat-

ed or aberrant actions. The arrangement between Ag–Mart and Mr. Gandhi continued over a period of years, spanning several months each calendar year. Thus, the Plaintiffs have demonstrated that the Defendants are liable for violations of the Act in both cases. The parties shall have **twenty days** to supplement their previously submitted pleadings regarding the issue of damages. The supplement shall not exceed **ten pages** per side. Accordingly, it is **ORDERED AND ADJUDGED**:

1. The clerk is directed to enter judgment in favor of Plaintiffs and against Defendants in CASE NO. 3:01–cv–1392–HLA–MMH;

2. The clerk is directed to enter judgment in favor of Plaintiffs and against Defendants in CASE NO. 3:02–cv–627–HLA–MMH;

3. The parties shall have **twenty days** to supplement their previously submitted pleadings regarding the issue of damages. The page limit shall be **ten pages**.